2010 UT 9

STATE of Utah, Plaintiff and Petitioner,

v.

Susan TRIPP, Defendant and Respondent.

No. 20081068.

Supreme Court of Utah.

Feb. 19, 2010.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., for plaintiff.

Ronald J. Yengich, Elizabeth Hunt, Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 On writ of certiorari, the State seeks review of the court of appeals' decision in *State v. Tripp*, 2008 UT App 388, 197 P.3d 99. The State asserts that the court of appeals erred when it reversed the trial court's denial of Defendant Susan Tripp's motion to suppress blood test results in her jury trial on a charge of automobile homicide. The court of appeals held that the State did not meet its burden to prove that her consent was voluntary, and it declined to affirm the trial court under the exigent circumstances exception or the inevitable discovery doctrine. *Id.* ¶ 26. We affirm.

## BACKGROUND

### I. MS. TRIPP KILLED A MOTOR-CYCLIST IN AN AUTOMO-BILE ACCIDENT

¶ 2 On April 23, 2004, Ms. Tripp was involved in an automobile-motorcycle accident. At about 6:50 p.m., Ms. Tripp drove her truck up to an intersection with a two-way stop sign. The intersection, located on the outskirts of West Jordan, was surrounded by farmland. Claiming she saw no traffic, she drove into the intersection. As she did, Ms. Tripp collided with a motorcyclist. A helicopter transported the severely injured motorcyclist to a hospital. The motorcyclist died the next day.

### II. THE POLICE ASKED AN APPARENTLY UNIMPAIRED MS. TRIPP TO GIVE A BLOOD SAMPLE

¶ 3 Shortly after 7:00 p.m., West Jordan Police Officer Doug Saunders arrived at the scene of the crash. Upon his arrival, Ms.

Tripp was sitting in her husband's car. Tripp's husband had arrived sometime earlier. Officer Saunders observed Ms. Tripp crying and shaking. She had a cigarette in her hand and a heavy odor of smoke about her. He did not observe any signs of impairment. Speaking to her from within three feet he did not smell any alcohol, nor could he detect any slurred speech. Officer Saunders asked Ms. Tripp to fill out some paperwork. She returned the paperwork properly completed. When he asked Ms. Tripp if she had consumed any alcohol or taken any prescription medications, she replied, "No." Officer Saunders later admitted that he had no reason to disbelieve Ms. Tripp.

¶ 4 As a matter of practice in serious investigations, and not based on any particularized suspicion, Officer Saunders wanted to rule out impairment. Officer Saunders asked Ms. Tripp to submit to a blood draw. Ms. Tripp told him that she was afraid of needles and did not want her blood drawn with one. When Officer Saunders asked Ms. Tripp if she would submit to a urinalysis, she said she would, but Officer Saunders never administered the test.

¶ 5 At 7:30 p.m., Cecilia Budd, a victim advocate in the employ of West Jordan City, arrived at the scene. She spent roughly two hours with Ms. Tripp. When Ms. Budd first made contact with Ms. Tripp, Ms. Tripp was still sitting in her husband's car. Ms. Budd testified that she smelled alcohol in the husband's car when she poked her head through the window but was not sure where the odor came from. Ms. Budd told Ms. Tripp that she was there to support her. Ms. Budd testified that she reported the odor of alcohol in the husband's car to an officer.

¶ 6 Ms. Budd observed that Ms. Tripp was very upset and cried most of the time and that her crying "was like a roller coaster." She also saw Ms. Tripp smoke one cigarette because, according to Ms. Tripp, it calmed her down.

¶ 7 At 8:05 p.m., Detective Daniel Roberts arrived at the scene to investigate the expected death. Officer Saunders delegated the task of obtaining Ms. Tripp's blood sample to Detective Roberts. Detective Roberts acknowledged that Officer Saunders did not identify any probable cause justifying a blood draw. Rather, as Detective Roberts understood, the blood draw was standard procedure for an accident involving a death and that if a death was involved he could force the blood draw.

¶ 8 When Detective Roberts asked Ms. Tripp to consent to a blood draw, she refused. She told him that she would only give blood if no needle were used. Detective Roberts knew of no way to obtain blood without a needle. Nonetheless, in the span of about forty-five minutes, Detective Roberts requested three times that Ms. Tripp consent to a blood draw. In at least one of these requests, Detective Roberts was accompanied by two other officers. Ms. Tripp consistently refused to a blood draw by needle, but she again told the officers she would submit to a urinalysis. Nonetheless, the officers never administered a urinalysis, performed any field sobriety tests, or sought a warrant for a blood draw.

¶ 9 When speaking with Ms. Tripp, Detective Roberts was about three to four feet away from her. He did not detect any odor of alcohol. He did observe, however, that her eyes were red. He did not see any tears, and no one told him that she had cried. She was shaking and seemed to be nervous. However, Detective Roberts testified that the more he visited with Ms. Tripp, the more concerned he became that Ms. Tripp was perhaps impaired. Specifically, he observed that the redness in her eyes did not dissipate and she did not cry, she "lacked concern" for the victim of the accident, and she continually smoked.

¶ 10 With this concern in mind, Detective Roberts asked the victim advocates, Cecilia Budd and Diana Greives, to talk with Ms. Tripp in order to calm her down and to help her "become more relaxed to the idea of having a blood draw." Ms. Budd testified that persuading Ms. Tripp to submit to the blood test was "not [her] job." Nevertheless, she explained to Ms. Tripp that she had seen the blood technician draw blood and that he was "good, very gentle, and that Ms. Tripp did not have to look at the needle."

## III. DETECTIVE ROBERTS ARREST-ED MS. TRIPP BECAUSE SHE RE-FUSED TO GIVE BLOOD

¶ 11 Each time Detective Roberts made his request, Ms. Tripp was seated in her husband's vehicle with her friends, family, and the victim advocates. Upon Ms. Tripp's adamant refusal of Detective Roberts's third request, he arrested her and informed her that he would force the blood draw with a warrant. He explained:

> [T]he more we tried to convince her, the more defiant she became and then her family and her friends started to intervene and tell us what we could do and what we couldn't do and we were losing control of the situation so I took her into custody and removed her where we could control the whole situation.

When asked how the family and friends interfered, Detective Roberts responded that they were "[t]elling her not to answer the questions.... Telling us that we couldn't take the blood and so I informed her that we were going to obtain a warrant then to get the blood draw and I took her into custody."

¶ 12 Detective Roberts did not handcuff Ms. Tripp, but he placed her in the back of his unmarked police car. At no time did Detective Roberts or any other officer read a *Miranda* warning to Ms. Tripp.

¶ 13 Detective Roberts asked Officer Joseph Monson to watch Ms. Tripp. Officer Monson did not know why Detective Roberts arrested Ms. Tripp. Officer Monson explained that although the family had interfered with the investigation, Ms. Tripp herself had never interfered. Further, Officer Monson did not detect any signs of impairment in Ms. Tripp. Ms. Tripp had no trouble walking, and Officer Monson did not smell any odor of alcohol.

¶ 14 At one point during the custody, Ms. Tripp's husband attempted to contact her while she was seated in the back of the unmarked car. Officer Monson refused to allow any contact, and he threatened to arrest the husband. Meanwhile, Ms. Budd remained by Ms. Tripp's side. Sitting in the backseat with Ms. Tripp, Ms. Budd again

smelled alcohol. This time she was sure the odor came from Ms. Tripp.

## IV. THE POLICE PROCURED A WARRANTLESS BLOOD DRAW

¶ 15 Detective Roberts testified that to obtain a warrant he customarily follows a certain procedure. This procedure requires him to review all the information with the officers at the scene, call another detective to help draft and review the warrant with the district attorney, and then obtain a district court judge's signature, which is available by electronic communication.

¶ 16 Detective Roberts never attempted to secure a warrant. When the blood technician, Brian Davis, arrived, Detective Roberts informed Mr. Davis of the need to obtain a warrant and that the process would take a couple of hours. When Mr. Davis learned that Ms. Tripp's nonconsent stemmed from her fear of needles, the two agreed that Mr. Davis would talk to Ms. Tripp to "work around [her] fear of needles," and that Ms. Tripp might give her consent because Mr. Davis was "not ... a police officer or involved in any of the original investigation [and] that she might be easier with [his] demeanor." Detective Roberts ordered Officer Monson to supervise the situation between Mr. Davis and Ms. Tripp. Detective Roberts did not return until Mr. Davis had drawn a blood sample.

¶ 17 Mr. Davis spoke with Ms. Tripp for about ten to fifteen minutes. Talking about six inches from Ms. Tripp's face, Mr. Davis noticed a slight odor of alcohol coming from Ms. Tripp's mouth. Mr. Davis testified that Ms. Tripp continually insisted that she was afraid of needles and wanted her husband. Mr. Davis also testified that "[a] couple of times during [the] conversation [he] kind of paraphrased her civil entitlements" and told her about her right to counsel and the right to remain silent.

¶ 18 At about 9:00 p.m., Mr. Davis took a blood sample from Ms. Tripp. During the draw, Ms. Tripp sat in the backseat of Detective Roberts's car. The door was open, and she sat with her legs and arms outside the

car. Mr. Davis recalled that Ms. Tripp was a "little upset" with Officer Monson. Mr. Davis told Ms. Tripp, "You know, just let me put the tourniquet on your arm, see if we can find a spot that would be easy to do this." Ms. Tripp told him, "[W]e'll go ahead and do that." Ms. Tripp stuck her arm out for Davis. He rolled up her sleeve and applied the tourniquet. Ms. Budd kneeled down to hold Ms. Tripp's other hand. Mr. Davis then said, "[W]e can go ahead and take care of this." But, as Mr. Davis testified, he did not think that Ms. Tripp knew he had all his equipment ready. Ms. Budd told Ms. Tripp "not to look at the needle because she was afraid of needles and take a deep breath." Officer Monson "shield[ed] Ms. Tripp's eyes so [she] wouldn't look at the needle." Mr. Davis stuck Ms. Tripp with the needle as quickly as he could and drew the blood. The draw did not take long. According to Mr. Davis and Ms. Budd, Ms. Tripp never said "no" and she did not tell Mr. Davis to "stop." However, Officer Monson testified that during the draw, Ms. Tripp was upset; "to me [she] looked terrified." Officer Monson did not remember Ms. Tripp's exact words, but he testified: "She was pulling away. She was crying."

¶ 19 After the draw, Ms. Tripp appeared to calm down; she did not say anything, but she stopped crying. Ms. Budd observed that Ms. Tripp was very calm after the draw, and that Ms. Tripp said "it wasn't as bad as she thought." A toxicology report of Ms. Tripp's blood sample revealed a blood alcohol level of .089 and a metabolite of cocaine.

## V. THE COURT OF APPEALS REVERSED THE TRIAL COURT'S DENIAL OF MS. TRIPP'S MOTION TO SUPPRESS

¶ 20 The State charged Ms. Tripp with one count of automobile homicide, a third degree felony, and one count of failure to yield the right of way, a class C misdemeanor. Prior to trial, Ms. Tripp filed a motion to suppress the evidence from the blood draw. She argued that her consent was involuntary. The trial court heard testimony at a suppression hearing. The trial court entered findings of fact, concluded that Ms. Tripp voluntarily

consented to the blood draw, and denied Ms. Tripp's motion to suppress. Following a four-day trial, a jury found Ms. Tripp guilty of both counts as charged. Ms. Tripp appealed.

¶ 21 The court of appeals reversed the trial court's denial of Ms. Tripp's motion to suppress. *See State v. Tripp*, 2008 UT App 388, 197 P.3d 99. Specifically, the court of appeals held that "the State did not meet its burden of proving that her consent was voluntary." *Id.* ¶ 26. Further, it declined to affirm on the exigent circumstances exception because "the State did not demonstrate that there was probable cause for a forcible blood draw." *Id.* It also declined to affirm on the inevitable discovery doctrine because the State failed to demonstrate any proper basis for discovery. *See id.* ¶¶ 24–25.

¶ 22 The State filed a petition for writ of certiorari, which we granted. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a) (2008).

## STANDARD OF REVIEW

¶ 23 "On certiorari, we review the court of appeals' decision for correctness, giving its conclusions of law no deference." *State v. Bujan*, 2008 UT 47, ¶ 7, 190 P.3d 1255 (internal quotation marks omitted). "The correctness of the court of appeals' decision turns on whether that court accurately reviewed the trial court's decision under the appropriate standard of review." *State v. Visser*, 2000 UT 88, ¶ 9, 22 P.3d 1242. A trial court's ruling on a motion to suppress is reviewed for correctness, including its application of the law to the facts. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699. The trial court's underlying factual findings are reviewed under the clearly erroneous standard. *See State v. Krukowski*, 2004 UT 94, ¶ 11, 100 P.3d 1222.

## ANALYSIS

¶ 24 The State asks that we reverse the court of appeals' decision. Specifically, the State argues that the court of appeals erred in three ways: (1) it imposed a burden of proof greater than that required by the Fourth Amendment when it demanded clear

and positive testimony that the consent was unequivocal and freely given; (2) it misassessed probable cause in considering whether the warrantless blood draw was justified under the exigent circumstances exception; and (3) it imposed a burden of proof for inevitable discovery greater than required under *State v. Topanotes,* 2003 UT 30, 76 P.3d 1159. We address each issue in turn.

## I. THE COURT OF APPEALS APPLIED THE PROPER STANDARD OF REVIEW FOR DETERMINING WHETHER MS. TRIPP VOLUNTARILY CONSENTED TO THE BLOOD DRAW SEARCH

¶ 25 The State argues first that the court of appeals erred by imposing a burden of proof greater than that required by the Fourth Amendment. According to the State, the court of appeals demanded a standard of "clear and convincing" by using the language of "clear and positive testimony that the consent was unequivocal and freely given." *State v. Tripp,* 2008 UT App 388, ¶ 14, 197 P.3d 99 (quoting *State v. Bredehoft,* 966 P.2d 285, 293 (Utah Ct.App.1998)). The State misreads this language and misinterprets its effect on the proper standard. We therefore affirm the court of appeals' decision.

¶ 26 The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Blood tests "plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons.'" *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). A warrantless search is per se unreasonable unless the search falls within one of the few " 'specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)(quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). A search conducted pursuant to consent is an established exception. *Id.* "[F]or a consent search to be valid, consent must have been given voluntarily...." *State v. Bisner,* 2001 UT 99, ¶ 43, 37 P.3d 1073.

¶ 27 In determining whether voluntary consent was given for a warrantless search, we have a two-prong analysis. "A consent is valid only if '(1) the consent was given voluntarily, and (2) the consent was not obtained by police exploitation of [a] prior illegality.'" *State v. Hansen,* 2002 UT 125, ¶ 47, 63 P.3d 650 (quoting *State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993)). As illustrated by our analysis of this first prong in *Hansen,* for a defendant to voluntarily consent to a search the defendant must (A) actually consent to the search and (B) consent must be voluntary. *See id.* ¶¶ 47, 48, 51.

¶ 28 Because the court of appeals held that consent was not given voluntarily, it did not need to address the second prong of police exploitation. We likewise analyze only the first prong of voluntary consent. But unlike the court of appeals, we analyze separately the underlying parts to the first prong of voluntary consent and address (A) whether Ms. Tripp actually consented and (B) whether Ms. Tripp's consent was voluntary. *See Tripp,* 2008 UT App 388, ¶¶ 14–17, 197 P.3d 99. In doing so we clarify the standard of review as to voluntariness.

*A. Testimony Reveals That the Findings of Fact Are Clearly Erroneous and That Ms. Tripp Did Not Consent to the Blood Draw*

¶ 29 The court of appeals concluded that Ms. Tripp did not give clear indication of her consent to the blood draw. Even though the court of appeals conflated consent and voluntariness into one analysis, we agree with its decision. The findings of fact that state Ms. Tripp consented are clearly erroneous given the testimony presented to the trial court at the suppression hearing.

¶ 30 "Before a court addresses whether consent was voluntary, it must first determine that there was consent." *Hansen,* 2002 UT 125, ¶ 48, 63 P.3d 650. The existence of consent is a factual finding, and it is based on the totality of the circumstances. *Id.* In making factual findings, the trial court "is in a unique position to assess the credibility of witnesses and weigh the evidence." *Id.* Accordingly, an appellate court should defer to the factual findings of the trial court un-

less the findings are clearly erroneous. *See id.; see also State v. Krukowski*, 2004 UT 94, ¶ 11, 100 P.3d 1222.

¶ 31 In this case, the trial court made seventeen factual findings. Two factual findings are clearly erroneous under the testimony presented to the trial court at the hearing on Ms. Tripp's motion to suppress. Specifically, the trial court found:

15. When asked by Mr. Davis if she would consent to the blood draw, the defendant voluntarily extended her arm.

16. When Mr. Davis drew the defendant's blood, she never tried to withdraw her arm and she never said "no" or "stop."

¶ 32 Although the court of appeals did not expressly hold that these two findings of fact were clearly erroneous, it focused on the interaction between Mr. Davis and Ms. Tripp at the time of the blood draw. *See Tripp*, 2008 UT App 388, ¶¶ 16–17, 197 P.3d 99. The testimony at the suppression hearing reveals that Ms. Tripp did not voluntarily extend her arm when asked to consent to the draw. Rather, Ms. Tripp extended her arm only in response to Mr. Davis telling Ms. Tripp, "You know, just let me put the tourniquet on your arm, see if we can find a spot that would be easy to do this." The court of appeals noted that Mr. Davis then made the ambiguous statement, "[W]e can go ahead and [take] care of this." *Id.* ¶ 16 (second alteration in original). The State, however, argues there was no ambiguity because at about this same time Ms. Budd told Ms. Tripp "not to look at the needle . . . and [to] take a deep breath," and Officer Monson shielded Ms. Tripp's eyes so she would not look at the needle. Yet, as the court of appeals emphasized, Mr. Davis testified that he did not think Ms. Tripp knew he had all his blood-drawing equipment ready. *See id.* The testimony also contradicts the finding that "[Ms. Tripp] never tried to withdraw her arm." Officer Monson testified that Ms. Tripp looked upset and terrified, and that "[s]he was pulling away . . . . [and] was crying." Given this testimony, the court of appeals did not err in concluding that Ms. Tripp did not clearly consent. Furthermore,

even if we assume Ms. Tripp consented, she did not do so voluntarily.

*B. Under the Totality of the Circumstances, the State Failed to Prove by a Preponderance of the Evidence That Ms. Tripp Voluntarily Consented to the Blood Draw*

¶ 33 In reviewing whether Ms. Tripp voluntarily consented, the court of appeals imposed " 'the totality of the circumstances' " standard. *Id.* at ¶ 14 (quoting *State v. Hansen*, 2002 UT 125, ¶ 56, 63 P.3d 650). The court of appeals further noted that it " 'look[s] to see if there is clear and positive testimony that the consent was unequivocal and freely given.' " *Id.* (quoting *Bredehoft*, 966 P.2d at 293). The State interprets this language as requiring a clear, positive, and unequivocal standard of proof—a standard stricter than that required under the Fourth Amendment. The State misreads this language and disregards the actual standard utilized by the court of appeals.

¶ 34 The State points out that the "clear, positive, and unequivocal" language stems from a test in *State v. Ham*, 910 P.2d 433, 439 (Utah Ct.App.1996). The *Ham* test consisted of three parts:

(1) There must be clear and positive *testimony* that the consent was unequivocal and specific and freely and intelligently given; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) [when evaluating these first two standards, we] indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

*Id.* (internal quotation marks omitted)(alteration in original) (emphasis added).

¶ 35 The State argues correctly that we rejected the *Ham* test in *Hansen*, 2002 UT 125, ¶¶ 54–55, 63 P.3d 650. But the State reads our rejection too broadly. In *Hansen*, we rejected the "intelligently given" portion of the first prong because it could imply that "a person must have knowledge of the right to refuse consent." *Id.* ¶ 54. We noted that the Supreme Court in *Schneckloth* forbade

this because the knowledge of the right to refuse is not a prerequisite to establish voluntary consent, but is rather a factor to be taken into account. *See id.* Also, we rejected the third prong of the *Ham* test because a waiver is incongruous with *Schneckloth. See id.* ¶ 55; *see also Bisner,* 2001 UT 99, ¶¶ 44–46, 37 P.3d 1073. However, we did not reject the remaining portions of the test. *See Hansen,* 2002 UT 125, ¶¶ 54–55, 63 P.3d 650. Yet insofar as the "clear, positive, and unequivocal" language causes confusion, we clarify the standard.

 ¶ 36 The voluntariness of consent to a search "is a legal conclusion, which is reviewed for correctness." *Id.* ¶ 51. "The appropriate standard to determine voluntariness is the totality of the circumstances test, and the burden of proof [faced by the prosecutor] is [the] preponderance of the evidence." *Id.* ¶ 56. There is no burden of proof that directly corresponds to a standard of "clear, positive, and unequivocal." Rather, the language of "clear and positive *testimony* that the consent was unequivocal and freely given" goes not to the standard of proof, but to the type of testimony. *Tripp,* 2008 UT App 388, ¶ 14, 197 P.3d 99 (internal quotation marks omitted)(emphasis added). This type of testimony is but one factor to be considered in the totality of the circumstances; its presence or absence is not itself determinative.

¶ 37 The totality of the circumstances requires careful scrutiny of "the details of the detention, and the characteristics of the defendant." *Hansen,* 2002 UT 125, ¶ 56, 63 P.3d 650. And "[t]he totality of the circumstances must show consent was given without duress or coercion." *Id.* We have identified five factors that may show a lack of duress or coercion:

(1) the absence of a claim of authority to search by the officers; (2) the absence of an exhibition of force by the officers; (3) a mere request to search; (4) cooperation by the owner of the vehicle; and (5) the absence of deception or trick[ery] on the part of the officer.

*Id.* (internal quotation marks omitted).

¶ 38 Turning to the court of appeals' decision, we hold that it properly applied the totality of the circumstances standard. Indeed, our review demonstrates that the court of appeals considered the factual findings and the testimony from the suppression hearing and found them wanting.

¶ 39 At the suppression hearing, the prosecutor did not present clear and positive testimony that Ms. Tripp unequivocally and freely gave her consent to the blood draw. Rather, as the testimony above reveals, the circumstances surrounding the blood draw were equivocal. This is only one factor of the analysis, but other factors demonstrate that Ms. Tripp's consent was the result of coercion and duress.

¶ 40 The police made more than a mere request to draw Ms. Tripp's blood. Different officers requested on at least four separate occasions that Ms. Tripp submit to a blood draw. Ms. Tripp refused. Though the first request by Officer Saunders may have been a mere request, the latter three requests were not. Within the course of forty-five minutes, Detective Roberts requested three times that Ms. Tripp submit to a blood draw. At least one time, he made the request with two other officers present. Each time she refused.

¶ 41 The State argues that Ms. Tripp refused solely because she feared needles. Also, the State stresses that Ms. Tripp agreed to submit to a urinalysis. Nonetheless, the State ignores that the police rebuffed Ms. Tripp's offer of cooperation; neither her fear nor her agreement to another test demonstrate her agreement to a blood draw. Ms. Tripp refused to submit to the blood draw; her motives did not negate her refusal.

¶ 42 Furthermore, the police exhibited force when Detective Roberts illegally arrested Ms. Tripp and threatened to force the blood draw with a warrant. When Ms. Tripp "adamantly refused," Detective Roberts, without identifying any reasonable suspicion, let alone probable cause, arrested her. Officer Monson acknowledged that he did not know why Detective Roberts arrested Ms. Tripp. Detective Roberts said he arrested Ms. Tripp because she became more "defiant" and he was "losing control of the situation" when Ms. Tripp's family and friends

intervened. But Officer Monson testified that Ms. Tripp herself never interfered. When pressed, Detective Roberts explained that Ms. Tripp's family and friends "interfered" by telling Ms. Tripp not to answer his questions and that the police could not take her blood. Thus, Detective Roberts arrested Ms. Tripp and threatened to force the blood draw with a warrant because she refused to waive her constitutional right.

¶ 43 Detective Roberts placed Ms. Tripp into custody. Although he did not handcuff Ms. Tripp, he secured her in the back of his unmarked car and asked Officer Monson to watch her. At no time did Detective Roberts or any other officer read Ms. Tripp her *Miranda* rights. Officer Monson secluded Ms. Tripp from all outside contact.

¶ 44 Finally, although it is unclear whether the police deceived or tricked Ms. Tripp, we are concerned by the police's use of Ms. Budd and Mr. Davis. Ms. Budd is a victim advocate. In this case, however, she appears to have been acting as an agent of the police. Ms. Budd focused her efforts on Ms. Tripp. Upon meeting Ms. Tripp, Ms. Budd informed Ms. Tripp that she was there for her support. Ms. Budd then smelled the odor of alcohol in the husband's car and reported it to an officer. Ms. Budd "comforted" Ms. Tripp for roughly two hours. Her vigilance continued even after Detective Roberts arrested Ms. Tripp. While the police isolated Ms. Tripp from family and friends, Ms. Budd remained by Ms. Tripp's side in the backseat of Detective Roberts's car. Also, Detective Roberts testified that after he grew concerned that

Ms. Tripp might be impaired, he asked Ms. Budd to calm Ms. Tripp and help her "become more relaxed to the idea of having a blood draw." Ms. Budd testified that this was "not [her] job." Still, she told Ms. Tripp that the blood technician was "very good, very gentle, and that Ms. Tripp did not have to look at the needle." She held Ms. Tripp's hand during the blood draw and told her "not to look at the needle . . . and [to] take a deep breath."

¶ 45 Similarly, although Mr. Davis is a blood technician, he followed the officers' direction. Upon Mr. Davis's arrival, Detective Roberts abandoned any attempt to secure a warrant in favor of letting Mr. Davis "work around [Ms. Tripp's] fear of needles." Mr. Davis testified that he and Detective Roberts agreed that if Mr. Davis talked to Ms. Tripp she might give her consent because he was "not . . . a police officer or involved in any of the original investigation [and] that she might be easier with [his] demeanor."

¶ 46 Weighing these factors under the totality of the circumstances test, it appears that the near constant police pressure and coercive tactics overcame Ms. Tripp's will. The court of appeals imposed the proper standard, and it correctly concluded that under the totality of the circumstances, the State failed to show by a preponderance of the evidence that Ms. Tripp voluntarily consented to the blood draw. Accordingly, we affirm the court of appeals' decision, which reversed the trial court's denial of Ms. Tripp's motion to suppress.[1]

1. We also note that because Detective Roberts arrested Ms. Tripp without probable cause, as discussed below, the arrest was illegal. Because of our holding, we need not address the second prong of *Hansen*, 2002 UT 125, 63 P.3d 650. We note, however, that the State fails to show that Ms. Tripp's "consent was not obtained by police exploitation of the prior illegality." *Id.* ¶ 47 (internal quotation marks omitted). This exploitation analysis "look[s] at the facts of each case" and three factors: "(1) the purpose and flagrancy of the illegal conduct, (2) the presence of intervening circumstances, and (3) the temporal proximity between the illegal detention and consent." *Id.* ¶ 64 (internal quotation marks omitted). This analysis reveals police exploitation in this case. First, the purpose of the illegal arrest was to obtain Ms. Tripp's consent. While the officers cited a routine practice of requesting blood sam-

ples in serious accidents, here, in the absence of any probable cause, they repeatedly requested a sample, arrested Ms. Tripp following her fourth refusal, confined her, isolated her from family and friends, reinitiated their requests, and then took her blood. Seeking her consent after the repeated refusals and her arrest shows the purpose of the illegal arrest "was to exploit the opportunity to ask for consent." *Id.* (internal quotation marks omitted). Second, although Mr. Davis informed Ms. Tripp of her right to counsel and right to remain silent, he is not an officer, and he only paraphrased these rights. Thus, there are no intervening circumstances present. Third, soon after Ms. Tripp was arrested, Detective Roberts, through Mr. Davis and Ms. Budd, continued to pressure Ms. Tripp. This brief time lapse and continued misconduct indicates exploitation. Accordingly, any voluntary consent given

## II. THE COURT OF APPEALS DID NOT ERR BY REFUSING TO AFFIRM ON EXIGENT CIRCUMSTANCES BECAUSE THE POLICE LACKED PROBABLE CAUSE

¶ 47 The State next asserts that the court of appeals erred by refusing to affirm the district court on the alternative ground of exigent circumstances. Specifically, the State argues that the court of appeals erred in its assessment of probable cause. We disagree; the court of appeals held correctly that the State failed to demonstrate probable cause.

¶ 48 "One class of exceptions to the warrant requirement [of the Fourth Amendment] is exigent circumstances." *State v. Rodriguez,* 2007 UT 15, ¶ 16, 156 P.3d 771. Under the exigent circumstances exception, the police may execute a warrantless search if probable cause exists in an exigent circumstance. "Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *State v. Dorsey,* 731 P.2d 1085, 1088 (Utah 1986) (alterations in original) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Probable cause is evaluated under the totality of the circumstances and deals with probabilities and "certain common-sense conclusions about human behavior" formulated by law enforcement officers. *Ill. v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted). However, where a search intrudes beyond the human body's surface, the interests of "dignity and privacy" require "a clear indication" that the desired evidence will be found. *Schmerber v. Cal.,* 384 U.S. 757, 769–70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). An exigent circumstance exists where there is "an urgency to acquire evidence that falls outside the ordinary course of law enforcement." *Rodriguez,* 2007 UT 15, ¶ 16, 156 P.3d 771.

¶ 49 Here, the court of appeals correctly concluded that the police lacked probable cause to perform the blood draw under the totality of the circumstances. The court of appeals considered the testimony of Detective Roberts, Officer Saunders, and Officer Monson. *See State v. Tripp,* 2008 UT App 388, ¶ 22, 197 P.3d 99. All testified that they did not detect an odor of alcohol or any signs of impairment. Also, the court of appeals was not convinced by Detective Roberts's observation of Ms. Tripp's red eyes and nervousness. *See id.*

¶ 50 Nonetheless, the State contends that the court of appeals ignored these and other facts. Detective Roberts grew concerned that Ms. Tripp was impaired when he observed that the redness of her eyes was not dissipating and that he had not seen Ms. Tripp cry. He also observed that Ms. Tripp continually smoked and that she lacked any concern for the victim. The State argues that Ms. Tripp's red eyes were a sign of impairment, her continuous smoking was used to mask the odor of alcohol, and her lack of concern suggested her preoccupation with guilt. Also, the State points out that Ms. Tripp failed to yield the right of way to the victim despite an apparently unobstructed view of the intersection. Finally, the State emphasizes that Ms. Budd and Mr. Davis detected an odor of alcohol from Ms. Tripp.

¶ 51 Although the court of appeals did not specifically mention these facts in its analysis, we conclude under the totality of the circumstances review that the result remains the same. The State isolates a few facts within the totality of the circumstances to the exclusion of others. The testimony of Ms. Budd, Officer Saunders, and Officer Monson reveals that Ms. Tripp was in fact crying. Although alcohol could have accounted for her red eyes, her crying—at times uncontrollable and "like a roller coaster"—was an equally, if not more plausible, reason. Similarly, testimony from Ms. Budd, who was with Ms. Tripp for nearly the entire time, reveals that Ms. Tripp only had one ciga-

by Ms. Tripp is the product of exploitation of the prior police illegality and should have been ex-

cluded to "effectively deter future illegalities." *Id.* ¶ 62 (internal quotation marks omitted).

rette, and that she smoked the cigarette to calm herself.

¶ 52 The testimony of Ms. Budd and Mr. Davis regarding the odor of alcohol from Ms. Tripp could form a basis for probable cause, but only if the officers had knowledge of it. *See State v. Worwood*, 2007 UT 47, ¶ 34, 164 P.3d 397. Here, they did not.

¶ 53 Testimony at the suppression hearing demonstrates that none of the officers knew that Ms. Tripp smelled of alcohol. Ms. Budd testified that when she first put her head into Ms. Tripp's husband's car, she detected the odor of alcohol. She could not, however, detect the source of the odor. She reported the odor to an officer. In contrast, sitting in the backseat of Detective Roberts' car with Ms. Tripp, Ms. Budd again detected the odor of alcohol; this time she was certain the odor came from Ms. Tripp. Mr. Davis also detected an odor of alcohol coming from Ms. Tripp's mouth. Nonetheless, neither Ms. Budd nor Mr. Davis reported these definitive observations to the police.

¶ 54 In the end, the State leaves us only with speculation as to Ms. Tripp's supposed preoccupation with guilt, and an accident with a motorcycle at an intersection surrounded by farmland. This does not create a basis for probable cause. Nor do such facts clearly indicate sufficient impairment to justify an intrusion into the human body. Accordingly, the State failed to demonstrate under the totality of the circumstances that probable cause existed. We thus hold that the court of appeals did not err in finding a lack of probable cause.[2]

---

2. The State requests that we declare the situation faced by the officers an exigent circumstance. The court of appeals did not address this issue. Because the lack of probable cause is dispositive, neither do we. We do note, however, that although the evanescent nature of alcohol alone does not create an exigent circumstance, the severity of an offense-in that the victim soon succumbed to his injuries-is a dominating fact as to the exigency of the situation. *See Rodriguez*, 2007 UT 15, ¶¶ 30, 57, 156 P.3d 771. We also recognize, however, that there can be no exception for exigency where the police themselves cause the exigent circumstance, as they arguably did here, by rebuffing Ms. Tripp's cooperation with a urinalysis in favor of a more accurate, thorough blood test. *See, e.g., United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983)

## III. THE COURT OF APPEALS' CONCLUSION COMPORTS WITH THE PROPER STANDARD REQUIRED FOR THE INEVITABLE DISCOVERY DOCTRINE

¶ 55 Finally, the State asserts that the court of appeals erred in refusing to affirm on the alternative ground of inevitable discovery. Because the court of appeals found the State's argument "conjectural at best" and unsupported by the record, the State argues that the court of appeals imposed a level of certainty greater than the proper preponderance of the evidence standard, as enunciated in *State v. Topanotes*, 2003 UT 30, 76 P.3d 1159. We disagree.

¶ 56 When evidence is the product of illegal governmental activity, a court must suppress the evidence to deter the illegality. *See Nix v. Williams*, 467 U.S. 431, 442–43, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). However, this deterrence rationale is undermined by the inevitable discovery doctrine. *See id.* at 444, 104 S.Ct. 2501. The inevitable discovery doctrine admits unlawfully obtained evidence if the police would have, in spite of the illegality, discovered the evidence by some other legal means. *See id.* To establish inevitable discovery, the prosecution must satisfy a preponderance of the evidence standard. *See Topanotes*, 2003 UT 30, ¶ 14, 76 P.3d 1159; *see also Nix*, 467 U.S. at 444, 104 S.Ct. 2501.

¶ 57 The inevitable discovery doctrine does not require " 'an entirely indepen-

---

("[A]gents cannot justify their search on the basis of exigent circumstances of their own making."); *State v. Beavers*, 859 P.2d 9, 18 (Utah Ct.App. 1993) ("[P]olice cannot create the exigency in order to justify a warrantless entry."). Additionally, we share concern with the court of appeals. Had the investigating officers not with "single-minded focus" pursued the blood test, they may have "amass[ed] facts to establish probable cause" by accepting Ms. Tripp's voluntary cooperation to a urinalysis and by performing field sobriety tests, or a Breathalyzer or Intoxilyzer test. *Tripp*, 2008 UT App 388, ¶ 22 n. 9, 197 P.3d 99. Nonetheless, because of the lack of probable cause we do not and need not address whether this situation constituted an exigent circumstance.

dent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation.'" *Topanotes*, 2003 UT 30, ¶ 15, 76 P.3d 1159 (quoting *State v. James*, 2000 UT 80, ¶ 15, 13 P.3d 576). But "[a] crucial element of inevitable discovery is independence; there must be some independent basis for discovery, and the investigation that inevitably would have led to the evidence [must] be independent of the constitutional violation." *Id.* ¶ 16 (internal quotation marks omitted) (alteration in original). Hence, in meeting its burden, the prosecution may present a hypothetical independent source. *See id.* ¶ 15. Such evidence may include "[r]outine or standard police procedures ... [as] a compelling and reliable foundation." *Id.* ¶ 17. Nonetheless, in the difficult cases, a court will be confronted with "whether a single, ongoing investigation would have developed an independent, legal avenue for discovery." *Id.*

¶ 58 Although the court of appeals failed to articulate preponderance of the evidence as the standard, its conclusion that the State offered no persuasive evidence comports with the standard. The court of appeals examined the record for an independent, lawful basis for discovery. It found none. Also, the court of appeals was not convinced by the State's hypothetical that the police would have obtained a warrant and discovered the blood alcohol evidence. Neither are we.

¶ 59 The State emphasizes the procedure for obtaining a warrant. Detective Roberts testified that to obtain a warrant he would have, among other steps, "review[ed] all the information with the officers at the scene." Because of this procedure, the State argues that Detective Roberts would have taken the necessary steps to secure a warrant. The State's position reminds us of the argument "if we hadn't done it wrong, we would have done it right." *Id.* ¶ 19 (internal quotation marks omitted). Although Detective Roberts threatened to seek a warrant, he took no steps whatsoever to obtain one. Rather, once Mr. Davis arrived, Detective Roberts abandoned the warrant idea in the hope of procuring Ms. Tripp's consent. Moreover, the procedure cited to by Detective Roberts assumes that he would have gathered infor-

mation leading to probable cause. As we discussed above, the police lacked probable cause. And even if we assume that Detective Roberts would have learned that Ms. Budd and Mr. Davis detected an odor of alcohol from Ms. Tripp's mouth, this tainted information arose only because Detective Roberts called off the warrant process. Accordingly, we hold that the court of appeals did not impose a more burdensome standard in rejecting the alternative ground of inevitable discovery, and we affirm its decision.

## CONCLUSION

¶ 60 We recognize that Ms. Tripp's actions caused the death of an innocent victim. Nonetheless, the Constitution establishes a balance between security and liberty. When the government disrupts that balance by coercion and duress to overcome free and voluntary choice, we are compelled, even in grievous cases, to enforce the constitutional balance.

¶ 61 Accordingly, we hold that in determining whether Ms. Tripp voluntarily consented, the court of appeals did not impose a burden of proof greater than required by the Fourth Amendment. We further hold that the court of appeals concluded correctly that the police lacked probable cause for the exigent circumstances exception to apply. Finally, we hold that the court of appeals did not impose a burden of proof greater than required under the inevitable discovery doctrine. We therefore affirm the court of appeals' decision to reverse the trial court's denial of Ms. Tripp's motion to suppress. We remand to the trial court for proceedings consistent with this opinion.

¶ 62 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.