2021 UT App 83

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
JONATHAN A. GONZALEZ,
Appellee.

Opinion
No. 20190810-CA
Filed July 29, 2021

Second District Court, Farmington Department
The Honorable David R. Hamilton
No. 181702012

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellant

Joseph Jardine and Peter D. Goodall, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1 In the middle of the night, an intruder entered Christina's[1] bedroom while she and her baby slept. He performed a lewd act while holding his cell phone and then left without further incident. After an investigation, the police believed Jonathan A. Gonzalez was the intruder and applied for a search warrant to obtain the cell tower location data for his cell phone. Based on an officer's supporting affidavit, a magistrate granted the request. Armed with evidence obtained as a result of the search and its fruits, the State charged Gonzalez with burglary, lewdness

---

1. A pseudonym.

involving a child, and lewdness. Gonzalez moved to suppress that evidence, arguing that the attesting officer had recklessly omitted material facts from the search warrant affidavit and that with the omitted material included, the affidavit did not support a finding of probable cause. The district court agreed with Gonzalez and granted his motion. Because we conclude that probable cause still exists with the inclusion of the omitted facts identified by the district court, we reverse.

BACKGROUND

¶2      After tossing and turning for several hours late at night, Christina finally dozed off while her baby lay sleeping in the same room. Christina's husband was away, working a twelve-hour shift. When he returned home early the next morning, he noticed that several things appeared to be amiss. With his curiosity piqued, Christina's husband checked the surveillance footage on the couple's nanny cam, which was positioned in their bedroom. The nanny cam footage showed, at 3:42 a.m., a figure walking through the dark bedroom where Christina and the baby slept.

¶3      While the intruder moved through the room, he removed his penis from his pants and proceeded to masturbate in the presence of Christina and the baby. While performing the lewd act, the intruder held a cell phone in his left hand, possibly taking pictures or recording a video. Also visible on the footage was a wedding ring worn on the intruder's left hand. Then, as abruptly as he entered, the intruder left.

¶4      The nanny cam never captured the intruder's face; he could be seen only from the chest down, wearing what appeared to be a light-colored hoodie and dark pants. Christina slept unaware of the entire incident and remained asleep until her husband woke her up. After viewing the footage, the couple reported the incident to the police.

¶5     From the beginning of their investigation, the police suspected that the intruder was someone familiar with Christina and her home. For one thing, there was no sign of forced entry; all the exterior windows and doors were locked. Also, another person living in the home reported hearing the garage door open and close multiple times during the same early-morning time frame over the prior month, but Christina's husband stated that he had "never repeatedly opened and closed the garage door" when coming home from work. And when the police first arrived at the scene, the cover to the garage keypad was partially opened, leading the police to suspect that the intruder gained access to the home through the garage.

¶6     A police lieutenant (Lieutenant) reviewed the nanny cam footage with Christina and asked her if she had any idea who the intruder might be. Christina first suggested her brother-in-law, stating that the intruder "looks similar to her brother-in-law, but that he doesn't wear a wedding ring, which the intruder wore." Next, she identified Gonzalez, a close family friend. She revealed to Lieutenant that "several years" ago she had fallen asleep on the couch and that she had woken up to find Gonzalez "snuggled up to her," in a "spooning-type position." She also said that "she believed" that Gonzalez's wife, also a close friend, "would have had the garage code to her home."

¶7     Later that day, Lieutenant visited the Gonzalezes' residence and met with Gonzalez's wife. Gonzalez's wife had seen the nanny cam footage and was concerned for her friend. She gave Lieutenant permission to search areas of the home where Gonzalez had clothing, and Lieutenant looked for clothing items matching what he thought the intruder was wearing in the nanny cam footage—very dark pants and a light-colored hoodie. Lieutenant performed a brief search of two separate closets where he took "quick, cursory glances through the clothing," but he did not find any items that matched the intruder's clothing. Because Lieutenant wanted to keep the

interaction "low-key," he spent less than a minute searching each closet.

¶8 Eventually, a detective (Detective) took over the investigation. Lieutenant briefed him on its status, including Lieutenant's search of the Gonzalezes' home. Lieutenant also told Detective about the incident of Christina waking up to find Gonzalez lying next to her. After familiarizing himself with the rest of the case, Detective went to interview Christina.

¶9 During their conversation, Christina again suggested both her brother-in-law and Gonzalez as possible suspects. Referring to her brother-in-law, she told Detective that "the body type [in the footage] looks like his." But she also expressed doubt that the intruder could be her brother-in-law because he was not married and the intruder wore a wedding ring. In addition, she noted that her brother-in-law did not own a cell phone like the one the intruder was seen holding in the footage. Finally, Christina stated that her brother-in-law "is just not that kind of person."

¶10 Referring to Gonzalez, Christina pointed out characteristics that suggested he could be the intruder, such as "his features are long and his hands look long." But she further observed that the intruder's "legs looked too short to be" Gonzalez's, while also speculating that the angle of the nanny cam may be to blame. She also led Detective to believe that she was "very apprehensive" about pointing the finger solely at Gonzalez for fear of harming her friendship with his wife.

¶11 On the same day Detective interviewed Christina, he discovered that the nanny cam inverted colors of clothing depicted in its footage—light-colored items appeared dark and dark-colored items appeared light. For example, the nanny cam reflected the black slacks worn by Detective as "pretty much pure white."

¶12    The next day, Detective found Gonzalez in his driveway and asked to speak with him. Detective observed that Gonzalez's physical "body type seemed very similar" to that of the intruder's and that "[h]is hands . . . appeared to be very similar, [including] the way that the ring sat on the ring finger." Detective also noticed that Gonzalez used his left hand to hold his cell phone, the same way the intruder did in the nanny cam footage.

¶13    After the encounter with Gonzalez, and after learning that the nanny cam inverted colors, Detective viewed photographs of Gonzalez on Gonzalez's wife's Facebook page. Detective observed from the photos that Gonzalez's body type was similar to that of the intruder in the nanny cam footage, Gonzalez and the intruder shared the same hand structure, and Gonzalez wore his wedding ring in the same location on his finger as the intruder.

¶14    Having concluded that Gonzalez was the intruder in the nanny cam footage, Detective drafted an affidavit to secure, among other things, the addresses of cell towers that "ping[ed]" Gonzalez's cell phone during and around the time that the intruder had broken into Christina's home. In that affidavit, Detective stated,

> On 05/14/18, Layton City Police began to investigate a residential burglary. At approximately 0342 hours, the suspect unlawfully entered the residence and walked into a downstairs bedroom where a woman and her infant child were sleeping. The suspect was captured on surveillance (never showing the suspect's face) performing what appears to be lewd acts with his penis. The suspect was holding a cell phone in his left hand near his penis during the

lewd act and it appeared the suspect was taking photographs inside the room or video recording.

There wasn't any forced entry into the residence and the doors and windows were still locked. Based on the circumstances of the burglary it is believed that the suspect was familiar with the victim and also the residence. Another resident reported hearing the garage door opening and closing multiple times during the same time frame for approximately the last month. This resident talked to the victim's husband who stated he never repeatedly opened and closed the garage door while arriving home from work during these time frames. When officers initially arrived on scene to check for any suspects, the cover to the garage key pad was partially opened and it is believed the suspect may have used the garage code to access the residence.

It is believed a close family friend, Jonathan Gonzalez, may be the suspect in this case. This belief is based on a previous inappropriate incident provided to police by the victim, which involves Jonathan. Jonathan also matches the physical description of the suspect captured on surveillance. Jonathan's wife and the victim's husband also work together and are on opposite shifts. Jonathan's wife works 4 AM to 4 PM and the victim's husband works 4 PM to 4 AM. This conflicting work schedule would provide Jonathan the ability to be at the victim's residence without his wife or the victim's husband being home. Jonathan also lives approximately two miles from the victim's residence.

A check was done of Jonathan's wife's public Facebook photograph page. There was an image that showed Jonathan's wedding ring. There was also an image that showed Jonathan's right hand. Jonathan's wedding ring on the Facebook photograph page and position of the ring on the finger was similar to the suspect's ring on the left hand and its position on his finger. Jonathan's right hand structure and finger length is also similar to the suspect's left hand and finger length as it is depicted in the video surveillance.

I later met with Jonathan to conduct an interview. While trying to talk with him, he was using his left hand to hold his cell phone. The suspect in the surveillance footage used his left hand to hold the cell phone while committing the lewd acts.

¶15 Detective did not provide in this affidavit any additional details about the "previous inappropriate incident" Christina had described. Nor did he divulge that Lieutenant had engaged in an unsuccessful search for clothing at Gonzalez's home. Detective also omitted any mention of Christina naming her brother-in-law as a possible suspect or her statement that the intruder's legs appeared to be shorter than Gonzalez's.

¶16 Based on the affidavit, the magistrate issued a search warrant, and the police obtained the cell tower location data for Gonzalez's cell phone. Using those records, the police determined that Gonzalez was "at or near" Christina's home during the time of the burglary. With this new information, the police obtained a second search warrant allowing them to search Gonzalez's home. With evidence gathered from both searches, the State charged Gonzalez with burglary, lewdness involving a child, and lewdness.

¶17    Gonzalez subsequently moved to suppress the evidence gathered through execution of the two warrants. He argued that the supporting affidavit for the first warrant was misleading because it omitted relevant evidence that negated probable cause. After hearing argument on the motion, the district court ordered an evidentiary hearing (*Franks* hearing) as provided in *Franks v. Delaware*, 438 U.S. 154 (1978), and *State v. Fuller*, 2014 UT 29, 332 P.3d 937. *See State v. Garcia*, 2007 UT App 228, ¶ 8, 164 P.3d 1264 ("In *Franks*, the Supreme Court held that a search warrant based on deliberate falsehoods or a reckless disregard for the truth must be evaluated to determine whether the affidavit supporting the warrant would still support probable cause once the false information is removed." (cleaned up)).

¶18    Following the *Franks* hearing and additional argument, the district court granted Gonzalez's motion to suppress. It found that Detective had "recklessly omitted" three pieces of "material information" that affected the probable cause determination. "First, the affidavit omitted the prior consensual search of [Gonzalez's] home . . . ." "Second, the affidavit omitted both [Christina's] statements of equivocation and her identification of a brother-in-law as matching the physical description of the suspect." "Third, the affidavit cryptically explains that [Gonzalez] is a suspect in this case because of 'a previous inappropriate incident provided to police by [Christina], which involves [Gonzalez]' and omitted relevant information that this 'previous inappropriate incident' occurred several years prior and what was the actual conduct." The court concluded that had the omitted information been included in the cell tower warrant affidavit, it "would have failed to support a finding of probable cause." The court thus voided both search warrants and suppressed all evidence obtained under them.

¶19    Without the evidence from the two searches, the case was dismissed. The State now appeals.

ISSUE AND STANDARDS OF REVIEW

¶20  On appeal, the State contends that the district court erred by granting Gonzalez's motion to suppress evidence for two reasons. First, the State argues that Detective was not reckless in omitting the three pieces of information identified by the district court. Second, the State argues that even if Detective's omission was reckless, probable cause for the search of the cell tower records still exists when those facts are included. This court reviews a district court's ruling on a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact. *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. Its factual findings are reviewed for clear error, and its legal conclusions, including whether the affidavit in support of a search warrant was sufficient to support a probable cause determination, are reviewed for correctness. *See id.*; *see also State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251 (reviewing a district court's ruling on a motion to suppress, "including its application of the law to the facts," for correctness).

ANALYSIS

¶21  The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures" and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

¶22  "The responsibility for issuing warrants and for meeting the pertinent constitutional requirements that underlie their issuance rests with the magistrate, a neutral and detached party who independently determines whether probable cause exists to support a search." *State v. Nielsen*, 727 P.2d 188, 190 (Utah 1986). A magistrate, however, must rely on the representations of the investigating officer, who sets forth in the warrant affidavit the

facts the officer contends are sufficient to meet the probable cause standard. *See id.*; *see also Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). Although it is not necessary that every fact recited be correct, the affidavit must be truthful "in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165.

¶23 A defendant may seek to invalidate a search warrant for lack of probable cause based on false statements in the supporting affidavit made "knowingly and intentionally, or with reckless disregard for the truth," by requesting an evidentiary hearing—a *Franks* hearing—to prove that claim. *Id.* at 155–56. The same is true if the affidavit is misleading due to the intentional or reckless omission of material facts. *See Nielsen*, 727 P.2d at 191 ("By an extension of reasoning, the same test applies when a misstatement occurs because information is omitted . . . ."); *see also State v. Fuller*, 2014 UT 29, ¶ 25, 332 P.3d 937.

¶24 To receive a *Franks* hearing for an alleged factual omission, a defendant must, by a "detailed offer of proof," (1) make a "substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading" and (2) demonstrate "that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Fuller*, 2014 UT 29, ¶ 25 (cleaned up). If a defendant satisfies this threshold burden, the defendant is entitled to a hearing but then "must prove by a preponderance of the evidence both that the omission in the affidavit was material and that the critical information was intentionally or recklessly excluded." *Id.* ¶ 26. In other words, even if a defendant proves that an affiant intentionally or recklessly omitted material information from a search warrant affidavit, the resulting warrant is still valid unless the defendant also proves that probable cause would not exist with the inclusion of the omitted information. *See Nielsen*, 727 P.2d at 191 ("The

obvious purpose of *Franks* and its progeny is to avoid suppressing evidence when the actual facts, if known to the magistrate, would have resulted in a finding of probable cause.").

¶25    Here, the district court granted Gonzalez's request for a *Franks* hearing and voided the search warrants issued in this case based on its determination that Detective "recklessly omitted material information that would have been critical to the finding of probable cause." Pointing to the three omissions mentioned previously, *see supra* ¶ 18, the court reasoned that "had the omitted information been provided the affidavit would have failed to support a finding of probable cause."

¶26    The State challenges the district court's determination on two grounds. First, the State argues that Detective did not recklessly mislead the magistrate by omitting the three pieces of information identified by the district court. Second, the State maintains that even if information was recklessly omitted, "the affidavit establishes probable cause even when the omitted facts are considered." Without resolving whether the evidence supported the district court's determination that Detective was reckless in his three omissions, we disagree with the court's probable cause determination. As explained below, we conclude that probable cause still exists even if the three omitted facts are considered as part of the warrant affidavit. To put those omissions in context, we first describe the probable cause standard and the basis for the magistrate's decision that the standard had been met. We then analyze whether probable cause exists with the three omissions included.

A

¶27    The probable cause standard imposed by the Fourth Amendment is not a rigid one. *See State v. Moreno*, 2009 UT 15, ¶ 37, 203 P.3d 1000; *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996) (describing probable cause as a fluid concept). The

standard is satisfied where "the known facts and circumstances" suffice to permit a person "of reasonable prudence" to believe that a search will reveal evidence of a crime. *Moreno*, 2009 UT 15, ¶ 37 (cleaned up); *see also Fuller*, 2014 UT 29, ¶ 22 ("The information necessary to show probable cause . . . does not require proof beyond a reasonable doubt; a magistrate need only have a substantial basis for concluding that a search would uncover evidence of wrongdoing." (cleaned up)). The task of determining probable cause requires a "totality-of-the-circumstances analysis": "whether, given all the circumstances . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

¶28　Detective sought cell tower location data for Gonzalez's cell phone, and based on the facts Detective presented, the magistrate found that there was probable cause to conclude that a search of the cell phone records would uncover evidence of the burglary. The affidavit on which the magistrate relied explained why Detective believed the intruder was familiar with the residence and then described Gonzalez as a close family friend who had been involved in "a previous inappropriate incident" with Christina. Detective also stated that Gonzalez "matches the physical description of the suspect captured on surveillance," and he explained how he had compared Gonzalez's hand structure and ring placement to that of the intruder as shown on the nanny cam footage and found that they were similar. Detective also explained that when he met Gonzalez, he observed that Gonzalez held his cell phone in a manner similar to the intruder. Finally, Detective described how the work schedule for Christina's husband would present Gonzalez with an opportunity to enter Christina's residence at a time her husband would not be home.

¶29　Gonzalez does not contend that Detective's affidavit, if truthful, failed to satisfy the probable cause standard with

regard to cell tower location data from the day of the burglary.[2] Instead, he contends that because certain facts were omitted from the affidavit, it was misleading and failed to establish probable cause.

B

¶30   The district court shared Gonzalez's view that the affidavit was misleading and concluded that Detective's omission of three facts altered the probable cause equation. We disagree with Gonzalez and the district court. We conclude that even with the omitted facts added, the affidavit still readily supports the determination that there is probable cause to believe Gonzalez was the intruder and that evidence of his crime would be found in the cell tower location data for Gonzalez's cell phone.

---

2. As part of an apparent invitation to this court to affirm on alternative grounds, Gonzalez argues that the search warrant lacked probable cause to the extent it authorized the collection of *prospective* cell tower location data for Gonzalez's phone (data the State never analyzed). We decline to affirm on this basis because Gonzalez has not shown that the proper remedy for an alleged overbreadth infirmity is to suppress data seized pursuant to the valid portions of the warrant. *See generally United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) ("Infirmity due to overbreadth does not doom the entire warrant; rather, it requires the suppression of evidence seized pursuant to that part of the warrant, but does not require the suppression of anything described in the valid portions of the warrant." (cleaned up)); *State v. Romero*, 660 P.2d 715, 717 (Utah 1983) ("The exclusionary rule does not require the suppression of otherwise legally seized evidence merely because it was obtained in the same search as evidence illegally seized. Only the evidence that was illegally seized should be suppressed." (cleaned up)).

1

¶31    The first omission the district court identified as material to the probable cause determination was the consensual search of two closets in Gonzalez's home. The court found that Lieutenant had made Detective aware that Gonzalez's wife had given him permission to search "areas of the home where [Gonzalez] had clothing"[3] and that Lieutenant had made "quick, cursory glances through the clothing." The court also found that after the search, police officers discovered that the nanny cam "inverted colors so the clothes Lieutenant . . . had been searching for were the wrong colors."

¶32    The affidavit may have been more complete had Detective informed the magistrate about the unsuccessful, consensual search, but once the circumstances of the search are put in context, the fact of the search does not undermine the probable cause determination. After all, Lieutenant's search was limited in scope and, even more importantly, he was searching for the wrong color of clothes. Lieutenant was unaware when he was glancing through Gonzalez's closets that the nanny cam inverted colors. As a result, when he should have been looking for light-colored pants and a dark hoodie, he was searching for the exact opposite. Thus, because Lieutenant was not looking for the right clothing, the fact that he searched but did not find what he was

---

3. The district court found that Lieutenant looked through "a hallway closet, bedroom closet, and dresser." The State challenges the court's finding that Lieutenant looked through a dresser as against the clear weight of the evidence. Although not critical to our analysis, we agree with the State's assessment of the evidence. Lieutenant testified that he briefly looked through two closets, but he never mentioned a dresser. Accordingly, we set aside the court's finding that a dresser was part of Lieutenant's search.

looking for is immaterial and does not alter the probable cause determination.

2

¶33 The second omission the district court identified as material was Christina's "statements of equivocation" regarding Gonzalez and her suggestion that her brother-in-law matched the intruder's physical description. Specifically, the court found that Christina had expressed uncertainty to Detective about whether Gonzalez was the intruder, citing her doubt about whether the length of Gonzalez's legs matched that of the intruder. The court also found that Christina had explained that the intruder looked similar to her brother-in-law except that unlike the intruder, her brother-in-law did not wear a wedding ring.[4]

---

4. The district court also found that at the time she was interviewed by the police, Christina "believed the physical description [of the intruder] more closely aligned with her brother-in-law." Once again, the State asks that we set this finding aside as clearly erroneous because it is against the clear weight of the evidence. Although we agree with the State that there is no direct evidence that Christina expressed the opinion attributed to her by the district court, it may be that the court drew this inference based on her testimony about the differences in body type. Because this inference is not an unreasonable one to make, we decline to set the finding aside. *See State v. Maestas*, 2012 UT 46, ¶ 201, 299 P.3d 892 ("In those instances in which the trial court's findings include inferences drawn from the evidence, we will not take issue with those inferences unless the logic upon which their extrapolation from the evidence is based is so flawed as to render the inference clearly erroneous."

(continued…)

¶34    In isolation, this omission weighs against the probable cause determination. Detective should have advised the magistrate that Christina had identified a second potential suspect and questioned whether the intruder's legs were "too short" to be Gonzalez's. But in determining probable cause, Christina's statements must be considered in context and with the totality of all the relevant facts. And when properly considered and viewed alongside all the other evidence, Detective's omissions do not undermine probable cause.

¶35    First, although Christina observed that the intruder's legs looked "too short" to be Gonzalez's, she offered a reasonable explanation for the discrepancy: the angle of the nanny cam. Also, in her interview with Detective, Christina identified physical characteristics of the intruder that did match Gonzalez's, such as his long features and his long hands. And despite Christina's reservation regarding the length of the intruder's legs, she did not retreat from her suspicion that the intruder could be Gonzalez. She expressed reservation only about accusing a close family friend.

¶36    Second, Detective had his own observations to rely on as well. He met with Gonzalez and noticed that he held his cell phone in his left hand just like the intruder. Detective also viewed photographs of Gonzalez on Facebook and believed that Gonzalez's hand was similar to the intruder's, including the way he wore his wedding ring.

¶37    Third, although Christina suggested her brother-in-law as a potential suspect because "the body type [in the nanny cam footage] looks like his," her own suspicion was dispelled by her

_____

(…continued)
(cleaned up)). Our analysis, however, does not turn on this detail.

acknowledgment of two significant facts: unlike the intruder, her brother-in-law did not wear a wedding ring, nor did he own a cell phone like the one the intruder was seen holding.

¶38    Taken together, Christina's comments reflect a lack of certainty about the identity of the intruder. But certainty is not the hallmark of probable cause. *See State v. Griffith*, 2006 UT App 291, ¶ 7, 141 P.3d 602 (noting that for the purposes of assessing probable cause, "[t]he officer's belief need not be characterized as a certainty"); *see also Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (explaining that probable cause "does not demand any showing that such a belief be correct or more likely true than false"). And Christina's comments, taken in context, are not so consequential as to undermine the weight of the other evidence pointing to Gonzalez.

3

¶39    The third omission the district court identified as material was the lack of detail provided for the prior "inappropriate incident" involving Christina and Gonzalez. The court explained that the affidavit "omitted relevant information that this 'previous inappropriate incident' occurred several years prior and what was the actual conduct." Once again, we disagree with the district court that these additional details diminished probable cause. On the contrary, we agree with the State that "[t]he omitted details . . . serve only to strengthen the force of that inappropriate incident."

¶40    When the magistrate issued the search warrant, he did not know that a few years before the incident with the intruder, Christina woke up to find Gonzalez snuggled up behind her in a spooning position. Learning these details of what was otherwise simply described as an "inappropriate incident" did not make it less likely that Gonzalez was the intruder—it made it more likely. Indeed, such conduct is indicative of Gonzalez's desire to be close (affectionately if not sexually) to Christina and his

willingness to fulfill that desire while she is asleep. Further, the fact that it occurred "several years" before the incident does not significantly diminish the force of his motive. Thus, the inclusion of these details only increases the likelihood that Gonzalez was the intruder and therefore does not undermine the original probable cause determination.

## CONCLUSION

¶41    Under the totality of the circumstances, the search warrant affidavit still supports a finding of probable cause with the inclusion of the three omitted facts identified by the district court. Thus, the district court erred when it granted Gonzalez's motion to suppress evidence. We therefore reverse the district court's ruling suppressing the evidence, vacate the order of dismissal, and remand for trial or such other proceedings as may now be in order.

———————