*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 24**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

DANIEL ROBERTS,
*Appellant.*

No. 20120884
Filed January 30, 2015

Seventh District, Castle Dale
The Honorable Douglas B. Thomas
No. 101700043

Attorneys:

Sean D. Reyes, Att'y Gen., Marian Decker, Asst. Att'y Gen.,
Salt Lake City, for appellee

Sean P. Hullinger, Lehi, for appellant

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE LEE joined.

JUSTICE PARRISH, opinion of the Court:

### INTRODUCTION

¶1    Daniel Roberts entered a conditional guilty plea to five charges of sexual exploitation of a minor arising from child pornography on his laptop computer. On appeal, Mr. Roberts challenges four of the district court's pretrial rulings. He first challenges the propriety of law enforcement's use of the Wyoming Toolkit, a computer program and database used to identify child pornography shared over the Internet through peer-to-peer file sharing networks. Mr. Roberts next challenges the district court's ruling that denied him discovery of the Wyoming Toolkit. He also brings a constitutional challenge to Utah's sexual exploitation of a minor statute (Sexual Exploitation Statute) under which he was charged, Utah Code section 76-5a-3 (2009) (renumbered as Utah Code section 76-5b-201). Finally, Mr. Roberts challenges the district

court's denial of his motion in limine to exclude all evidence obtained by or related to the Wyoming Toolkit. We affirm the district court on all issues.

## BACKGROUND

¶2    Utah's Internet Crimes Against Children task force (ICAC) works to prevent the online distribution of child pornography. The ICAC searches peer-to-peer (P2P) file sharing networks for child pornography being shared among P2P users. Gnutella, one such P2P network, allows its users to share digital files directly over the Internet.[1] Gnutella uses what is called the secure hash algorithm (SHA-1) encryption method to assign a unique digital signature to each file shared over its network. Because each digital file has a different SHA-1 value, those values can be used to identify a file. Through prior investigations, law enforcement has compiled a database of thousands of SHA-1 values that correspond to files containing child pornography. This database, along with software that searches Gnutella for the identified SHA-1 values, is known as the Wyoming Toolkit.

¶3    The ICAC uses the Wyoming Toolkit to monitor Gnutella for IP addresses sharing files with suspect SHA-1 values. Once the Toolkit flags an IP address sharing a file with an SHA-1 value that matches known child pornography files, officers confirm that the suspect file is indeed child pornography either by downloading and viewing the file directly or by comparing the identified file's SHA-1 value with SHA-1 values of known child pornography contained in databases like the National Child Victim Identification Program. Upon confirming that the identified file is child pornography, officers send an administrative subpoena to the applicable internet service provider to obtain the subscription information associated with the identified IP address.

¶4    During a 2009 investigation, the ICAC determined that an IP address in Emery County, Utah, had used Gnutella to share hundreds of "files with SHA-1 digital signatures identical to images of suspected child pornography" during a five month period. The ICAC submitted these findings to FBI Agent Sonja Nordstrom. Upon

---

[1] For additional information on Gnutella, see *Definition of: Gnutella*, PCMAG.COM, http://www.pcmag.com/encyclopedia/term/43835/gnutella (last visited Jan. 20, 2015).

confirming the files contained child pornography,[2] Agent Nordstrom served a subpoena on Emery Telecom, the local internet service provider, which was able to identify Mr. Roberts as the owner of the suspect IP address. Based on this information, Agent Nordstrom obtained a search warrant for Mr. Roberts' home and computers.

¶5    Mr. Roberts was not home the day police officers executed the search warrant. Agent Nordstrom called Mr. Roberts on his cell phone to inform him of the search, but did not discuss the purpose of the investigation. Mr. Roberts told Agent Nordstrom that he was in Ogden, Utah, where his wife was in the hospital. Agent Nordstrom later spoke with Mr. Roberts' wife, who indicated that Mr. Roberts had his laptop computer with him in Ogden.

¶6    Agent Nordstrom traveled to Ogden to meet with Mr. Roberts. Mr. Roberts brought his laptop to the meeting, and Agent Nordstrom explained to Mr. Roberts that he was being investigated for possession of child pornography. After some questioning, Mr. Roberts admitted that he had been downloading child pornography for approximately a year and that he had been in the process of deleting the child pornography from his computer since Agent Nordstrom had called him. After Mr. Roberts made this admission, Agent Nordstrom asked if she could see his laptop. Mr. Roberts consented. Agent Nordstrom subsequently obtained a search warrant specifically for Mr. Roberts' laptop.

¶7    Mr. Roberts' laptop was taken to a computer forensic lab, where an examiner found video and still images of child pornography. Mr. Roberts was charged with thirty counts of sexual exploitation of a minor, a second degree felony. UTAH CODE § 76-5a-3 (2009).[3] Before trial, Mr. Roberts made four motions that are the subject of this appeal. First, he moved to suppress the evidence of child pornography found on his laptop. Relying on the United States Supreme Court case *Kyllo v. United States*, 533 U.S. 27 (2001), Mr. Roberts argued that the Wyoming Toolkit, like the thermal

---

[2] To confirm the content of these files, Agent Nordstrom compared the SHA-1 values of the files shared by Mr. Roberts with the SHA-1 values of files she had previously viewed that contained child pornography.

[3] In 2011, the Legislature renumbered section 76-5a-3 as 76-5b-201 and made minor change to its substance. Because Mr. Roberts was charged prior to this amendment, we rely on the May 2009 version for purposes of his appeal.

image scanning at issue in *Kyllo*, constituted a search, and therefore use of the Toolkit without a warrant violated the Fourth Amendment to the United States Constitution. Mr. Roberts further argued that he had an expectation of privacy in the contents of his computer and that by accessing those contents through the Wyoming Toolkit, the State violated his expectation of privacy through an unlawful search. The district court denied Mr. Roberts' motion, reasoning that the Wyoming Toolkit did not have "the same intrusiveness as thermal imaging" and that "peer-to-peer file sharing is not entitled to a reasonable expectation of privacy."

¶8    Second, Mr. Roberts moved to compel discovery of the Wyoming Toolkit and its methodologies. He also moved to compel discovery of "any and all associated program documentation, instruction manuals, technical support materials, training materials, and purchase documents . . . to verify that the images [he] is alleged to have possessed are in fact[] illegal images." The district court granted the motion in part and denied it in part. It held that Mr. Roberts was entitled to discovery of "whatever information the State has in regards to this case," including "any information the State has" regarding the SHA-1 values associated with the files found on Mr. Roberts' laptop. But it denied Mr. Roberts' motion to compel discovery of every SHA-1 value in the Wyoming Toolkit database and "the search algorithm process and methodology utilized" in the Toolkit. It reasoned that discovery of the Toolkit was unnecessary for the purpose Mr. Roberts alleged because Agent Nordstrom had personally verified that the files Mr. Roberts had shared on Gnutella were indeed child pornography and because "disclosure of investigative techniques and procedures would interfere with law enforcement efforts."

¶9    Third, Mr. Roberts moved to dismiss the case on the ground that Utah's Sexual Exploitation Statute is unconstitutional. Mr. Roberts argued that the statute violates the Uniform Operation of Laws Provision of the Utah Constitution on its face because it unconstitutionally distinguishes between (1) individuals who illegally possess child pornography and (2) individuals who may legally possess child pornography such as law enforcement officers acting within the scope of a criminal investigation and employees or agents of entities that report and prevent child pornography when they are acting in good faith and within the scope of their

4

employment.[4] Mr. Roberts also argued that, as applied, the statute discriminates between prosecuting attorneys and defense attorneys who may come into possession of child pornography during their representation or prosecution of a defendant charged under the Sexual Exploitation Statute. Mr. Roberts asserted that defense attorneys, but not prosecuting attorneys, who come into possession of child pornography would be in violation of the statute.

¶10 The district court denied Mr. Roberts' motion to dismiss, holding that the Sexual Exploitation Statute was not unconstitutional. Although the statute creates distinct classifications between those who may and may not legally possess child pornography, the district court reasoned that those classifications do not "impose any disparate treatment on persons similarly situated." (Citing *State v. Robinson*, 2011 UT 30, 254 P.3d 183).

---

[4] The relevant language of Utah Code section 76-5a-3, effective May 2009, is as follows:

> (1) A person is guilty of sexual exploitation of a minor:
>     (a) when the person:
>         (i) knowingly produces, possesses, or possesses with intent to distribute child pornography; or
>     (ii) intentionally distributes or views child pornography;
>     . . . .
> (5) This section may not be construed to impose criminal or civil liability on:
>     (a) any entity or an employee, director, officer, or agent of an entity when acting within the scope of employment, for the good faith performance of:
>         (i) reporting or data preservation duties required under any federal or state law; or
>         (ii) implementing a policy of attempting to prevent the presence of child pornography on any tangible or intangible property, or of detecting and reporting the presence of child pornography on the property; or
>     (b) any law enforcement officer acting within the scope of a criminal investigation.

¶11 The district court also rejected Mr. Roberts' as-applied challenge to the statute. While it acknowledged that defense attorneys and prosecutors are similarly situated and that the statute discriminates between them, it concluded that the distinction is justified by a legitimate government interest in eliminating the market for child pornography. It also observed that law enforcement allows defense attorneys to view evidence of child pornography as part of their representation, if they do so at the Regional Computer Forensics Lab (RCFL). It therefore held that although prosecutors and defense attorneys are treated differently under the statute, the restriction on defense attorneys is not overly burdensome, is reasonable, and is justified by the State's interest in eliminating the dissemination of child pornography.

¶12 Finally, Mr. Roberts filed a motion in limine to preclude the State from offering expert testimony on the Wyoming Toolkit. He argued that the admission of evidence regarding "the technical elements of the Wyoming Toolkit, the scientific principles that underlie the technology, or the reliability of the inputs required by the system" would be impermissible under the Utah Rules of Evidence because "[t]he reliability of the methods has not been demonstrated by the State, nor has the defense had opportunity to challenge them."

¶13 The district court held an evidentiary hearing on Mr. Roberts' motion to exclude expert testimony, during which the State presented the testimony of Special Agent Coy Acocks, an expert on the Wyoming Toolkit. Agent Acocks testified as to the methodologies of the Toolkit, explaining that the technology used to develop the Toolkit is publicly available and could be used by anyone to search P2P networks. He also testified that the Toolkit correctly identifies child pornography files with extraordinarily high accuracy. Agent Acocks explained that officers using the Toolkit do not rely on the Toolkit alone to obtain a warrant to search a suspected computer. Rather, they conduct further investigation by reviewing files that the Toolkit has identified as child pornography to confirm the Toolkit's accuracy. Mr. Roberts presented no competing expert testimony or other evidence challenging Agent Acocks' testimony.

¶14 At the conclusion of the hearing, the district court ruled from the bench that the Wyoming Toolkit employed reliable methods based on "fairly common and available standard processes." The court found that the officers using the Toolkit are well trained, that the SHA-1 values' reported accuracy is reliable,

and that the process used to ascertain IP addresses is reliable. The court also found that the Toolkit "is simply a tool to be used by law enforcement officers as one step in the investigation of a case. It is not the conclusion." Once officers use the Toolkit to identify possible child pornography, they undertake additional steps to assure that the files identified by the Toolkit and associated with a certain IP address are actually child pornography. The court thus concluded that the Wyoming Toolkit was a reliable basis for expert testimony.

¶15 Mr. Roberts entered a plea agreement with the State under which he pled conditionally guilty to five counts of sexual exploitation of a minor. The State dismissed the remaining twenty-five counts. The district court subsequently sentenced Mr. Roberts to concurrent prison terms of one-to-fifteen years, but suspended the prison terms and placed Mr. Roberts on 36 months of probation, including 240 days in the county jail. Mr. Roberts timely appealed his conviction to the court of appeals, which certified his appeal to this court. He challenges each of the pretrial rulings identified above. We have jurisdiction under Utah Code section 78A-3-102(3)(b).

## STANDARDS OF REVIEW

¶16 Different standards of review apply to each of Mr. Roberts' arguments. We review for correctness the district court's denial of Mr. Roberts' motion to suppress on the ground that law enforcement's use of the Wyoming Toolkit constituted an unlawful search. *State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251. Because district courts "have broad discretion in matters of discovery," we review for an abuse of discretion the district court's ruling that denied Mr. Roberts discovery of the Wyoming Toolkit. *Green v. Louder,* 2001 UT 62, ¶ 37, 29 P.3d 638. Mr. Roberts' constitutional challenge to the Sexual Exploitation Statute presents a question of law that we review for correctness, recognizing that "all statutes are presumed to be constitutional and the party challenging a statute bears the burden of proving its invalidity." *State v. Angilau*, 2011 UT 3, ¶ 7, 245 P.3d 745 (internal quotation marks omitted). Finally, because district courts "have considerable discretion in determining the admissibility of expert testimony," we review Mr. Roberts' challenge to the expert testimony regarding the Wyoming Toolkit for an abuse of discretion. *State v. Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133.

## ANALYSIS

### I. MR. ROBERTS' ARGUMENTS ARE ADEQUATELY BRIEFED

¶17 As a preliminary matter, we address the State's contention that Mr. Roberts' arguments are inadequately briefed. The State

argues that Mr. Roberts' appellate brief "is filled with conclusory assertions and virtually bereft of citations to the record" and "provides no meaningful analysis" of the district court's rulings. The State thus asks us to dismiss each of Mr. Roberts' arguments as inadequately briefed.

¶18 Rule 24 of the Utah Rules of Appellate Procedure "prescribe[s] standards for the form, organization, and content of a brief on appeal." *State v. Nielsen,* 2014 UT 10, ¶ 33, 326 P.3d 645. Rule 24 requires that the arguments "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on." UTAH R. APP. P. 24(a)(9). This standard for adequate briefing is a subjective standard, and determining compliance is left to the discretion of the appellate court. *Nielsen*, 2014 UT 10, ¶ 34. In exercising this discretion, we assess the adequacy of a brief "not as a matter of gauging procedural compliance with the rule, but as a necessary component of our evaluation of the case on its merits." *Id.* While we may exercise our discretion to disregard or strike briefs that do not comply with rule 24's substantive requirements, UTAH R. APP. P. 24(k), we are not required to do so. *See State v. Thomas,* 961 P.2d 299, 305 (Utah 1998) (explaining that "failure to cite to pertinent authority may not always render an issue inadequately briefed"). Therefore, like the marshaling requirement imposed by rule 24(a)(9) of the Rules of Appellate Procedure, our adequate briefing requirement is not a "hard-and-fast default notion." *Nielsen*, 2014 UT 10, ¶ 40. Instead, it is a "natural extension of an appellant's burden of persuasion." *Id.* ¶ 41. As a result, appellants who fail to follow rule 24's substantive requirements will likely fail to persuade the court of the validity of their position.

¶19 Despite the discretionary nature of our briefing requirements, we have seen an increasing number of appellees who spend considerable time arguing over the adequacy of the appellant's brief, rather than addressing the merits of the appellant's position. In taking such an approach, appellees are often guilty of the very deficiency of which they complain. Although the briefing standard articulated in rule 24(a) is directed in the first instance to appellants, rule 24(b) applies those same requirements to the brief of the appellee. *Broderick v. Apartment Mgmt. Consultants, L.L.C.,* 2012 UT 17, ¶ 10, 279 P.3d 391. As a result, an appellee who argues only that the appellant has inadequately briefed issues will likely fail to submit a brief that "contain[s] the contentions and reasons of the appellee with respect to the issues presented in the opposing brief."

*Brown v. Glover*, 2000 UT 89, ¶ 22, 16 P.3d 540. Appellees who rely solely on inadequate briefing arguments therefore assume a considerable risk of defaulting on appeal.

¶20 In this case, although the State's initial brief addressed the merits of some of Mr. Roberts' claims, it did not address the merits of two of his claims. Instead, it argued only that those claims had been inadequately briefed. In so doing, the State took the risk that we would disagree with its assessment of the adequacy of Mr. Roberts' briefing and thereby forfeit its chance to respond to the merits of those two claims. While we could have defaulted the State for its failure to argue the substance of the issues, we exercised our discretion to provide the State with an opportunity to supplement its brief. We caution, however, that an appellee who fails to respond to the merits of an appellant's argument will risk default. Rather than challenging the adequacy of an appellant's brief, an appellee should instead layout the relevant legal standard and point out why the appellant has failed to carry his burden of persuasion.

¶21 Having clarified the standard for adequate briefing, we conclude that most of Mr. Roberts' arguments are adequately briefed. Although Mr. Roberts' arguments are in some instances poorly articulated and weakly supported by legal authority, his briefing does not fall below the requirements of rule 24. Unlike cases where the appellant "failed to cite *any* case law from *any* jurisdiction in order to set forth the elements of, or the legal standards for, his claims," *Carlton v. Brown*, 2014 UT 6, ¶ 20, 323 P.3d 571, Mr. Roberts has generally cited to legal authority to support his arguments. And while his citations to the record are sparse, he has, for the most part, directed this court to the relevant motions, memoranda, and district court rulings that are the subject of his appeal.

¶22 In summary, Mr. Roberts has adequately briefed most of his arguments. That some of his arguments are not well organized or persuasive does not necessarily mean they are inadequately briefed. Instead, it suggests that Mr. Roberts has not satisfied his burden of persuasion on appeal.[5]

---

[5] We do, however, agree with the State as to the inadequacy of Mr. Roberts' arguments that the district court erred in denying his motion to clarify its ruling on the discovery of the Wyoming Toolkit. Although Mr. Roberts asserts error, he does not direct us to any place in the record where the district court made a ruling on this

(continued...)

## II. THE DISTRICT COURT DID NOT ERR IN DENYING MR. ROBERTS' MOTION TO SUPPRESS

¶23  Mr. Roberts argues that the district court erred in denying his motion to suppress the evidence of child pornography found on his computer under the theory that law enforcement's use of the Wyoming Toolkit constituted an illegal search. According to Mr. Roberts, the warrant that the State obtained to search his computer was based on an unlawful search of the files Mr. Roberts shared on Gnutella. He argues that the evidence obtained from that search therefore should have been suppressed. He also argues that the administrative subpoena issued to Emery Telecom was improper. We disagree. Law enforcement's use of the Wyoming Toolkit to identify files freely shared on P2P networks does not constitute a search. And the Emery Telecom subpoena was procedurally sound under the law as it existed at the time it was issued.

### A. Use of the Wyoming Toolkit to Identify Child Pornography in a File Shared Openly on a P2P Network Is Not a Search

¶24  The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." Government conduct that infringes upon a subjective and "reasonable expectation of privacy" constitutes a search and therefore cannot take place absent a valid warrant or a recognized exception to the warrant requirement. *State v. Price*, 2012 UT 7, ¶ 9, 270 P.3d 527 (internal quotation marks omitted). A subjective and reasonable expectation of privacy exists when "(1) an individual has 'exhibited an actual (subjective) expectation of privacy' and (2) 'the expectation [is] one that society is prepared to recognize as reasonable.'" *Id.* (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). In this case, we must decide whether Mr. Roberts had a subjective expectation of privacy in files he shared on Gnutella and, if so, whether that expectation of privacy was objectively reasonable.

---

[5](...continued)

issue, nor does he explain the district court's basis for denying the motion. Indeed, Mr. Roberts failed to request the transcript of the hearing in which the court heard argument on this issue. As a result, we have no basis on which to review the district court's ruling on the discoverability of the Wyoming Toolkit.

¶25 Although we have yet to consider whether a reasonable expectation of privacy exists in a file shared over a P2P network, several federal courts have considered the issue and none has found an expectation of privacy. *See United States v. Hill*, 750 F.3d 982, 986 (8th Cir. 2014) ("[A] defendant has no reasonable expectation of privacy in files . . . retrieved from his personal computer where [the defendant] admittedly installed and used LimeWire to make his files accessible to others for file sharing." (second and third alterations in original) (internal quotation marks omitted)); *United States v. Conner*, 521 F. App'x 493, 497 (6th Cir. 2013) (finding no reasonable expectation of privacy in files shared through a P2P file-sharing program); *United States v. Norman*, 448 F. App'x 895, 897 (11th Cir. 2011) (same); *United States v. Borowy*, 595 F.3d 1045, 1047–48 (9th Cir. 2010) (same); *United States v. Perrine*, 518 F.3d 1196, 1205 (10th Cir. 2008) (same). We agree with this federal precedent and hold that there is no reasonable expectation of privacy in a file that an individual publicly shares on a P2P network.

¶26 In this case, Mr. Roberts publicly shared his files on Gnutella, thereby rendering them publicly available to anyone with a Gnutella client. And because Mr. Roberts made no effort to limit access to his files on Gnutella, he exhibited no subjective expectation of privacy in those files. Neither the ICAC's investigation of Mr. Roberts' publicly shared files nor its use of the Wyoming Toolkit to identify the files as child pornography constituted a search. The Wyoming Toolkit merely enabled the ICAC officers to recognize files with SHA-1 values associated with child pornography. But it did not allow the government to access private information on Mr. Roberts' computer. It therefore did not invade a constitutionally protected private space.

¶27 Without acknowledging the federal case law undermining his argument, Mr. Roberts relies on the United States Supreme Court's opinion in *Kyllo v. United States*, 533 U.S. 27 (2001). In *Kyllo*, the Court held that the use of thermal imaging scanners to detect high-intensity lamps used to grow marijuana in a home constituted an unlawful search. *Id.* at 40. The Court reasoned that the thermal imaging intruded on the interior of the home, which is protected by a high expectation of privacy. *Id.* The Court thus held that where "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.*

¶28 Mr. Roberts focuses on the fact that the government in *Kyllo* used technology that is not publicly available. He argues that, like the thermal imaging scanners at issue in *Kyllo*, the Wyoming Toolkit is not accessible to the public. But the greater concern in *Kyllo* was that the government was using the technology to intrude the privacy of the home. The Wyoming Toolkit, on the other hand, is used only to identify child pornography in files that are publicly shared on P2P network. Unlike thermal imaging scanners, the Toolkit does not intrude on any interest in which the defendant has a reasonable expectation of privacy. Use of the Toolkit therefore does not constitute an unlawful search.

*B. A Search Did Not Take Place When Law Enforcement Obtained Mr. Roberts' Subscription Information from His Internet Service Provider*

¶29 In addition to challenging the government's use of the Wyoming Toolkit, Mr. Roberts argues that the government conducted an unconstitutional search when it used his IP address to identify him through the Emery Telcom subpoena. But Mr. Roberts once again ignores the overwhelming weight of authority finding no reasonable expectation of privacy in subscription information, like an IP address, given to an internet service provider. *See Perrine*, 518 F.3d at 1204 ("Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation.").

¶30 Although Mr. Roberts points to no case law in support of his position, he relies on two recently enacted statutes that he argues are relevant to the propriety of the Emery Telecom subpoena. The first, Senate Bill 46, which became effective on March 25, 2014, amends the administrative subpoena statute to require the signature of a judge rather than a prosecutor for all administrative subpoenas. 2014 Utah Laws 254–55 (ch. 47); *see also* UTAH CODE § 77-22-2.5. The second, House Bill 128, which became effective on July 1, 2014, added provisions to the Utah Code that now require law enforcement to obtain a warrant to search for the location information of an electronic device. 2014 Utah Laws 942–43 (ch. 223); *see also* UTAH CODE § 77-23c-101 to -103.

¶31 Mr. Roberts relies on our per curiam decision in *State v. Belgard,* 615 P.2d 1274, 1276 (1980), to argue that these statutory amendments apply retroactively to his case and that the administrative subpoena issued to Emery Telecom in 2009 was procedurally deficient. In *Belgard*, this court, quoting the Seventh

Circuit, stated:

> It is well established that when a lower court relies on a legal principle which is changed by treaty, statute, or decision prior to direct review, an appellate court must apply the current law rather than the law as it existed at the time the lower court acted. 'Intervening and conflicting decisions will thus cause the reversal of judgments which were correct when entered.'

*Id.* (quoting *United States v. Fitzgerald*, 545 F.2d 578, 581 (7th Cir. 1976)). When viewed in isolation, the *Fitzgerald* and *Belgard* line of cases appears to support the retroactive application of these statutes. But the United States Supreme Court has clarified that this rule is inapplicable where the legislature has expressed its intent that a statute not be applied retroactively. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 837–38 (1990) (explaining that, in the context of retroactivity, "where [legislative] intent is clear, it governs").

¶32   In Utah, the Legislature has expressed a clear presumption against retroactive application. UTAH CODE § 68-3-3 ("A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive."). As a result, we generally "apply the law as it exists at the time of the event regulated by the law in question." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. Because the intent of the Legislature is clear in this regard, we repudiate our *Belgard* decision insofar as it purportedly expresses a presumption in favor of retroactive application.

¶33  In this case, neither statute on which Mr. Roberts relies declares that it applies retroactively. We therefore apply the law as it existed at the time of the relevant event, which in this case was the State's issuance of the administrative subpoena  Emery Telecom in October 2009. At that time, Utah Code section 77-22-2.5(2) permitted prosecutors to issue administrative subpoenas, and the Utah Code did not require a warrant to search an electronic device's location information. Because the Emery Telecom subpoena was issued in compliance with the law at the time, we reject Mr. Roberts' challenge to its validity.

¶34  In summary, we hold that the government's use of the Wyoming Toolkit to identify child pornography in files shared on a P2P network does not constitute a search. And under the law that was in place at the time, a search did not take place when law enforcement obtained Mr. Roberts' subscription information through

the subpoena to Emery Telecom. We therefore affirm the district court's denial of Mr. Roberts' motion to suppress.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING MR. ROBERTS' MOTION TO COMPEL DISCOVERY OF THE WYOMING TOOLKIT

¶35 Mr. Roberts argues that the district court abused its discretion in denying his motion to compel discovery of the Wyoming Toolkit, including its methodologies and all of the SHA-1 values in its database. We review this claim for an abuse of discretion and the appellant bears a heavy burden in showing that the district court abused its discretion. *R & R Energies v. Mother Earth Indus., Inc.*, 936 P.2d 1068, 1079 (Utah 1997). To meet this burden, the appellant must show either "an erroneous conclusion of law or [that] there is no evidentiary basis" for the district court's discovery ruling. *Id.* (internal quotation marks omitted). Mr. Roberts has shown neither.

¶36 In ruling on the motion to compel, the district court allowed Mr. Roberts to discover any information the State had regarding his case, including the SHA-1 values associated with files found on his laptop. But the district court denied the remainder of Mr. Roberts' discovery request for two independent reasons: (1) that discovery of the Toolkit would not produce the evidence Mr. Roberts sought (i.e., verification that the files Mr. Roberts had shared and that the Toolkit had detected were indeed child pornography) and (2) that disclosure of all of the Toolkit's methodologies and SHA-1 values would harm future ICAC investigations.

¶37 Mr. Roberts' main argument on appeal is that the Toolkit and its methodologies are not privileged. But the district court did not hold that the Toolkit was privileged information; it merely held that discovery of all aspects of the Toolkit and its methodologies were not relevant and would be harmful to future ICAC investigations. And because Mr. Roberts provides no authority to the contrary, he has failed to show that the district court abused its discretion by denying discovery.

¶38 Moreover, Mr. Roberts does not address the district court's alternative ground for denying the motion: that discovery of the Toolkit would not be useful in verifying that the files Mr. Roberts had shared on Gnutella contained child pornography. *See Salt Lake Cnty. v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 28, 297 P.3d 38 (explaining that an appellate court "will not reverse a ruling of the trial court that rests on independent alternative

grounds where the appellant challenges only one of those grounds"). As the district court reasoned, discovery of all of the Toolkit's SHA-1 values would not have been helpful to Mr. Roberts because the government relied on Agent Nordstrom's review of the files, rather than on the Toolkit's SHA-1 values, to verify that those files contained child pornography. Discovery of the Toolkit and its methodologies was therefore not material to Mr. Roberts' case. *See State v. Spry*, 2001 UT App 75, ¶ 21, 21 P.3d 675 (explaining that under the "good cause" standard in Utah Rule of Criminal Procedure 16(a)(5), a defendant must "establish the materiality of the requested records to the case" (internal quotation marks omitted)). Mr. Roberts has made no attempt to refute this basis for denying his motion.

¶39   In summary, Mr. Roberts has failed to meet his burden of persuasion on appeal. And where the district court permitted discovery of those aspects of the Wyoming Toolkit that were most relevant to Mr. Roberts' case, it did not abuse its discretion in denying discovery of the entire Toolkit database, its methodologies, and all of its SHA-1 values. We therefore affirm the district court's discovery ruling.

## IV. MR ROBERTS' CONSTITUTIONAL CHALLENGE TO THE SEXUAL EXPLOITATION STATUTE FAILS

¶40 Mr. Roberts challenges the Sexual Exploitation Statute under the Uniform Operation of Laws Provision of the Utah Constitution. UTAH CONST. art. I, § 24 ("All laws of a general nature shall have uniform operation."). He argues that the statute creates at least two unconstitutional classifications. First, he claims that the statute unconstitutionally distinguishes between individuals who can legally view child pornography (i.e., law enforcement officers acting to further a criminal investigation and employees of designated entities acting in good faith to report or prevent child pornography) and those who may not. *See* UTAH CODE § 76-5a-3 (2009). Second, he argues that the statute unconstitutionally distinguishes between prosecuting attorneys who encounter child pornography as part of their work and similarly situated criminal defense attorneys. We reject both arguments—the first on its merits and the second due to a lack of standing.[6]

---

[6] Mr. Roberts clearly has standing to raise his first challenge to the Sexual Exploitation Statute because (1) he has suffered an injury (i.e.,

(continued...)

*A. The Classifications Created by the Sexual Exploitation Statute Are Constitutional*

¶41 For a statute to comply with the Uniform Operation of Laws Provision of the Utah Constitution, "it is not enough that it be uniform on its face. What is critical is that the operation of the law be uniform." *Gallivan v. Walker*, 2002 UT 89, ¶ 37, 54 P.3d 1069 (internal quotation marks omitted). A statute is not uniform in its operation, and is thus unconstitutional, if (1) "the statute creates any classifications," (2) those classifications "impose any disparate treatment on persons similarly situated," and (3) "the legislature had [no] reasonable objective that warrants the disparity." *State v. Robinson,* 2011 UT 30, ¶ 17, 254 P.3d 183 (internal quotation marks omitted).

¶42 Looking to the first *Robinson* requirement, Mr. Roberts correctly argues that the Sexual Exploitation Statute creates certain classifications. Most notably, it imposes criminal and civil liability on individuals who "knowingly produce[], possess[], or possess[] with intent to distribute" or "intentionally distribute[] or view[] child pornography"; but the statute exempts from liability law enforcement officers who encounter child pornography as part of a criminal investigation and employees of certain organizations acting in good faith and within the scope of their employment to report or prevent child pornography. UTAH CODE § 76-5a-3 (2009).

¶43 Under the second *Robinson* requirement, however, these classifications are not unconstitutional because they do not discriminate between similarly situated individuals. The key distinction between the individuals in each classification is the context within which they view, possess, or distribute child pornography. The statute exempts only those law enforcement officers "acting within the scope of a criminal investigation" and only employees of specific entities who are "acting within the scope of employment" and "for the good faith performance of" reporting or preventing child pornography. *Id.* Any law enforcement officer or

---

[6](...continued)
criminal prosecution and conviction), (2) that injury was caused by the statute's alleged unconstitutionality, and (3) we have the authority to redress his injury if we determine the statute is unconstitutional. *See Carlton v. Brown*, 2014 UT 6, ¶ 31, 323 P.3d 571 (explaining that to have standing, a party must show injury, causation, and redressability).

employee of an exempt entity who knowingly or intentionally produces, possesses, views, or distributes child pornography for any other reason will be subject to the same criminal liability as other individuals. Because this classification does not distinguish between similarly situated individuals, it fails the second requirement of the *Robinson* test. The Sexual Exploitation Statute therefore does not violate the Uniform Operation of Laws Provision of the Utah Constitution based on this classification.

*B. Mr. Roberts Lacks Standing to Challenge the Constitutionality of the Sexual Exploitation Statute's Disparate Treatment of Prosecutors and Criminal Defense Attorneys*

¶44 Mr. Roberts also contends that the Sexual Exploitation Statute unconstitutionally distinguishes between prosecuting attorneys and defense attorneys.[7] Specifically, he argues that prosecuting attorneys, are exempt under the Sexual Exploitation Statute when viewing, possessing, or distributing child pornography within the scope of a criminal investigation. Defense attorneys, on the other hand, are granted no such exemption, and thus would be in violation of the statute by possessing, viewing, or distributing child pornography as part of their legal representation of a criminal defendant.

¶45 On its face, the Sexual Exploitation Statute provides no exemption for criminal defense attorneys who must view evidence that may include child pornography in order to zealously advocate for their clients. Before addressing the constitutionality of this apparent oversight, however, we must first determine whether Mr. Roberts has standing to bring this challenge. *See Gregory v. Shurtleff*, 2013 UT 18, ¶ 9, 299 P.3d 1098 ("Since standing is a jurisdictional requirement, we first must determine whether

---

[7] In 2009, the Legislature amended the Sexual Exploitation Statute to expressly exclude liability for law enforcement officers and employees of exempt organizations. *See* UTAH CODE § 76-5b-201(6). It did not, however, include an exemption for others involved in the judicial process who may be required to view child pornography during the course and within the scope of their employment. As a practical matter, those involved in the judicial process, including judges, court staff, jurors, and lawyers—both prosecuting and defense—are unlikely to be prosecuted under this statute. Nevertheless, the Legislature may wish to consider broadening the exclusion to include such participants in the judicial process.

Appellants have standing to bring any of their claims."); *see also State v. Tuttle,* 780 P.2d 1203, 1207 (Utah 1989) (explaining that this court may raise the issue of standing "*sua sponte* at any time").

¶46 Standing requires that we view the constitutionality of a statute from the perspective of the party raising the challenge. *See State v. Hoffman,* 733 P.2d 502, 505 (Utah 1987) ("The constitutionality of a statute is considered in light of the standing of the [party] who raises the question and of its particular application in his case."). To establish standing under our traditional test, the party bringing a constitutional challenge must show three things: (1) "that [the party] has been or will be adversely affected by the [challenged] actions," (2) that a "causal relationship [exists] between the injury to the party, the [challenged] actions and the relief requested," and (3) that the relief requested is "substantially likely to redress the injury claimed." *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.,* 2006 UT 74, ¶ 19, 148 P.3d 960 (second and fourth alterations in original) (internal quotation marks omitted).

¶47 Under the first requirement, a party may only challenge a statute "to the extent the alleged basis of its infirmity is, or will be, applied to his detriment." *Hoffman,* 733 P.2d at 505. In other words, to obtain standing, a party challenging a statute must suffer an injury as a result of the statute's alleged unconstitutionality. In this case, Mr. Roberts has not shown that he has been or will be injured by the alleged unconstitutionality of the Sexual Exploitation Statute. Instead, he raises only a hypothetical injury. He argues that because defense attorneys could be subject to criminal and civil liability for viewing evidence containing child pornography, their representation of criminal defendants charged under the Sexual Exploitation Statute will be hindered, thereby depriving criminal defendants of their right to effective assistance of counsel. But Mr. Roberts cannot establish an actual injury. First, Mr. Roberts bases his alleged injury on *defense counsel's* fear of prosecution—not his own. But a party generally lacks standing "to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973).

¶48 And although Mr. Roberts alleges an indirect harm to criminal defendants based on defense counsel's fear of prosecution, he has not shown that *his* counsel genuinely feared prosecution so as to render his counsel's representation ineffective. While Mr. Roberts baldly asserts that his counsel was "unable to challenge the provenance and character of the evidence against him" because counsel was "at jeopardy of criminal prosecution" under the statute,

he wholly fails to substantiate this assertion. In fact, defense counsel was given government-sanctioned access to the child-pornography evidence at the RCLF without threat of prosecution. As the district court noted in ruling on this issue, "[d]efense counsel has not alleged that its access to the evidence was in any way inadequate under the facts of this case."

¶49 Defense counsel's purported fear of prosecution and the impact of that fear on counsel's representation of Mr. Roberts are speculative at best, and therefore are insufficient to demonstrate an injury for purposes of standing. *See Midvale City Corp. v. Haltom*, 2003 UT 26, ¶ 22, 73 P.3d 334 (citing to United States Supreme Court precedent for the proposition that "standing exists when fear of criminal prosecution under allegedly unconstitutional statute is not imaginary or wholly speculative"); *Younger v. Harris*, 401 U.S. 37, 42 (1971) ("[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate [parties] in such cases."). Because Mr. Roberts cannot demonstrate that he has or will suffer an actual injury based on the Sexual Exploitation Statute's disparate treatment of prosecutors and criminal defense attorneys, he lacks traditional standing to challenge the statute's constitutionality.

¶50 We next consider whether Mr. Roberts has standing under our alternative, public-interest test. *See Gregory*, 2013 UT 18, ¶ 25. Parties who fail to gain standing under the traditional test may nevertheless have standing "if they can show that they are an appropriate party raising issues of significant public importance." *Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n*, 2009 UT 48, ¶ 8, 214 P.3d 95. But the party arguing alternative standing has the burden of showing it satisfies the requirements of this test. *See Sierra Club*, 2006 UT 74, ¶ 36.

¶51 Mr. Roberts has not presented any argument as to why he should be granted standing under our alternative test. By not presenting any argument, Mr. Roberts fails to satisfy his burden of showing that he is entitled to public-interest standing.

¶52 In summary, we conclude that Utah's Sexual Exploitation Statute does not violate the Uniform Operation of Laws Provision of the Utah Constitution because it does not treat similarly situated individuals differently. And Mr. Roberts lacks standing to challenge the constitutionality of the Sexual Exploitation Statute's purported disparate treatment of prosecuting and defense attorneys.

## V. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING MR. ROBERTS' MOTION TO PRECLUDE EXPERT TESTIMONY ON THE WYOMING TOOLKIT

¶53  Mr. Roberts' final argument is that the district court erred in denying his motion in limine to preclude expert testimony on the Wyoming Toolkit. He contends that the Wyoming Toolkit does not satisfy the reliability test for expert testimony required by rule 702 of the Utah Rules of Evidence. Mr. Roberts carries a heavy burden in seeking reversal of this ruling because we grant district courts broad discretion in determining the admissibility of expert testimony. *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794. We will therefore reverse the district court only if its decision "exceeds the limits of reasonability." *Id.* (internal quotation marks omitted). In this case, the district court was well within its discretion in denying Mr. Roberts' motion. We therefore affirm.

¶54 Rule 702 of the Utah Rules of Evidence governs the admissibility of expert witness testimony. It requires first that the testimony of an expert witness "help the trier of fact to understand the evidence or to determine a fact at issue." UTAH R. EVID. 702(a). Second, a party seeking to rely on expert scientific or technical testimony may do so only "if there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." *Id.* 702(b). The advisory committee notes to rule 702 emphasize that a party seeking to admit expert testimony "is required to make only a 'threshold' showing . . . [, which] requires only a basic foundational showing of indicia of reliability for the testimony to be admissible, not that the opinion is indisputably correct." *Id.* 702 advisory committee note. This low threshold permits district court judges, as the gatekeepers of evidence, to err on the side of admission as long as there is some minimal indication that the evidence is reliable. We note, however, that the rigor of rule 702 "will vary depending on the complexity of the particular case." *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 15, 242 P.3d 762.

¶55  In this case, the district court held that expert testimony on the Wyoming Toolkit satisfied rule 702's threshold of reliability. The court found that the Toolkit's use of SHA-1 values to identify child pornography files was based on a reliable "mathematical formula" that results in "an extraordinarily high degree of correlation between the SHA-1 value and the actual image." The court also found that the Wyoming Toolkit uses software that is "readily available" and

"fairly common," thereby refuting Mr. Roberts' claim that the Toolkit relies on undefined scientific methods. The court further found that the officers using the Toolkit were well trained and that adequate safeguards were in place to assure that a file identified by the Toolkit was indeed child pornography. The court thus found that the Wyoming Toolkit was reliable, was based upon sufficient facts or data, and was reliably applied to the facts of Mr. Roberts' case.

¶56 On appeal, Mr. Roberts argues that the expert testimony on the Wyoming Toolkit did not satisfy the reliability requirements of rule 702, but he provides no authoritative support for his claim. He offers no evidence to refute the district court's reliability determination,[8] cites to no legal or other authority that might undermine the reliability of the Wyoming Toolkit, and points to nothing in the record to support his position. Instead, he simply asserts without any supporting authority that the Toolkit is not as reliable as the district court found it to be. In short, Mr. Roberts has failed to provide any evidence that the district court abused its discretion in admitting the expert testimony on the Wyoming Toolkit. Contrary to Mr. Roberts' unsupported claims, the State provided substantial evidence of the Toolkit's accuracy and the validity of its methodologies. Based on this evidence, the district court's finding that the Toolkit was reliable was supported by the evidence and therefore met rule 702's threshold reliability requirement.

¶57 In summary, we affirm the district court's denial of Mr. Roberts' motion in limine because Mr. Roberts has not provided any evidence that the district court abused its discretion under rule 702 of the Utah Rules of Evidence by admitting expert testimony about the Wyoming Toolkit.

## CONCLUSION

¶58 We affirm each of the district court's pretrial rulings in this case. First, the district court correctly found that the State's use of the Wyoming Toolkit did not constitute a search under the Fourth Amendment because Mr. Roberts had no reasonable expectation of privacy in files he publicly shared on a P2P network. Nor did an

---

[8] Mr. Roberts could have argued that he was unable to present evidence about the Toolkit because he was denied discovery. But he has neither raised nor briefed that argument here, so we decline to address it. *See Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 10 n.4, 63 P.3d 686.

unlawful search take place when law enforcement obtained Mr. Roberts' subscription information from Emery Telecom. Second, the district court did not abuse its discretion in limiting Mr. Roberts' discovery of the Wyoming Toolkit database and its methodologies. Third, the district court correctly dismissed Mr. Roberts' constitutional challenges to the Sexual Exploitation Statute. Finally, the district court did not abuse its discretion in admitting expert testimony on the Wyoming Toolkit. We therefore affirm Mr. Roberts' conviction for violation of the Sexual Exploitation Statute.